NORTHERN ILLINOIS GAS COMPANY, Plaintiff-Appellant, *v.* ENERGY COOPERATIVE, INC., Defendant-Appellee.

Third District   No. 3—83—0331

Opinion filed March 27, 1984.

942

Mayer, Brown & Platt, of Chicago, and Black & Black, of Morris, for appellant.

Samuel A. Haubold and Stephen R. Patton, both of Kirkland & Ellis, of Chicago, and Eugene W. Hayes, of Dunn & Hayes, of Morris, for appellee.

Neil F. Hartigan, Attorney General, of Springfield (Hercules F. Bolos, Special Assistant Attorney General, of counsel), for *amicus curiae* Illinois Commerce Commission.

JUSTICE HEIPLE delivered the opinion of the court:

An action was brought in the circuit court of Grundy County by Northern Illinois Gas Company (hereinafter NI-Gas), seeking a declaratory judgment that it had properly ceased performance under a long-

term supply contract with Energy Cooperative, Inc. (hereinafter ECI). ECI counterclaimed for breach of contract and the jury returned a verdict for $305.5 million on ECI's counterclaim. The facts are as follows.

NI-Gas is a public utility which distributes natural gas to customers throughout the northern third of Illinois (excluding Chicago). As a public utility, NI-Gas is subject to regulation by the Illinois Commerce Commission (hereinafter ICC) under the Public Utilities Act (Ill. Rev. Stat. 1981, ch. 111⅔, pars. 1 through 95).

In order to deal with a natural gas shortage in the early to mid-1970's NI-Gas received permission from the ICC to construct a supplemental natural gas (SNG) plant. The plant began operation in 1974 using various types of feedstock which were converted into natural gas. One type of feedstock was naphtha, which was supplied by Atlantic Richfield Company (ARCO), pursuant to a contract entered into with NI-Gas in 1973. The ARCO contract was assigned to ECI in 1976.

The contract was to remain in force for 10 years or until 56 million barrels of naphtha had been delivered to NI-Gas. By late 1979 and early 1980 it became apparent to NI-Gas that the demand for natural gas was decreasing while the price of naphtha was steadily increasing. These changes were caused essentially by Federal decontrol of natural gas supplies in 1978 and increases in the price of crude oil which determined the price ECI charged for naphtha.

Between 1974 and 1978 NI—Gas had been holding large amounts of gas in storage facilities. In 1980, the ICC denied NI-Gas' request for a rate increase partly because NI-Gas was holding, in ICC's opinion, an unreasonably large amount of gas in storage. Since NI-Gas was not permitted to raise its rates, it decided to reduce the inventory by cutting back on SNG production, which was its most expensive source of gas.

NI-Gas successfully negotiated reductions in SNG feedstock shipments with two of its suppliers. At the time of the ICC rate order, ECI had been voluntarily delivering reduced quantities of naphtha. Rather than seek further reductions, NI-Gas attempted to negotiate an end to the contract with ECI. When negotiations failed, NI-Gas terminated its performance as of March 31, 1980.

On March 17, 1980, NI-Gas filed suit seeking a declaratory judgment that it had no further obligations under the contract and that ECI's damages, if any, were limited to the amount specified by the liquidated damages clause of the contract. ECI counterclaimed for $230 million in damages (the alleged difference between the contract

and market prices of naphtha on February 29, 1980, when ECI asserted it learned of NI-Gas' termination of the contract), and unspecified additional damages.

NI-Gas' reply to the counterclaim alleged as affirmative defenses that its nonperformance was justified by (1) circumstances beyond its control within the meaning of the *force majeure* provisions of the contract; (2) NI-Gas' obligation to comply with the Illinois Public Utilities Act; (3) the commercial impracticability of continued performance; and (4) circumstances beyond NI-Gas' control that had frustrated the purpose for which it had entered into the contract. NI-Gas further alleged that any relief to which ECI may be entitled is limited by the liquidated damages clause of the contract; that ECI is precluded from obtaining the relief requested because it failed to mitigate its damages; and that, with respect to any naphtha (or any product made from naphtha) disposed of by ECI to a third party, ECI's damages, if any, are measured by the difference between the contract and resale prices, less expenses saved by ECI as a result of NI-Gas' termination.

Subsequently, NI-Gas filed its second amended complaint, alleging the January 3, 1980, order of the ICC as a specific event of *force majeure* that excused its performance. The second amended complaint also added the allegations that ECI had deliberately overcharged NI-Gas for naphtha during the first three months of 1980, that ECI had not complied with its obligation of good faith in the performance of the contract and therefore had breached the contract, and, in addition, that NI-Gas had been damaged in an amount in excess of $3,000,000.

On June 10, 1982, the circuit court (1) denied NI-Gas' motion for summary judgment on the *force majeure* and liquidated damages defenses; (2) granted ECI's motion to strike NI-Gas' liquidated damages defense; and (3) granted summary judgment for ECI on NI-Gas' *force majeure*, frustration of purpose, and public utility defenses. Later, the trial court granted summary judgment for ECI on NI-Gas' allegations of fraud and breach of contract by ECI because of its alleged overcharges to NI-Gas during the first quarter of 1982. The trial court directed a verdict for ECI on NI-Gas' defense of commercial impracticability after the close of the evidence.

Prior to trial, the court entered judgment for NI-Gas for the amount of ECI's overcharge and precluded NI-Gas from referring to this judgment during trial. The court also granted ECI's motion *in limine* to exclude evidence concerning liquidated damages, *force majeure* and NI-Gas' status and duties as a regulated public utility.

Although NI-Gas raises six main issues on appeal, we need only

discuss five. They will be presented under the following three headings: (1) Liquidated Damages; (2) The Affirmative Defenses and; (3) The Court's Evidentiary Rulings.

LIQUIDATED DAMAGES

NI-Gas argues that the trial court erred in denying its motion for summary judgment on the liquidated damages clause and in striking the liquidated damages defense. The court held that the liquidated damages clause of the contract (section 13) gave the nonbreaching party the choice of recovering either actual or liquidated damages. ECI chose to pursue actual damages resulting in a jury award of $305.5 million.

NI-Gas contends that the liquidated damages clause is clear and unambiguous and provides the exclusive measure of damages in the event of default:

"XIII. *Liquidated Damages*:

If, prior to the delivery to PURCHASER of the total number of Barrels of Feedstock specified in Section III hereof, this Agreement is terminated by reason of either party's default, prior to the expiration of the term set forth in Section II above, then, upon demand of the party not in default, the defaulting party shall pay to the other as liquidated damages, a sum in cash determined by multiplying one cent ($0.01) by the difference between the total gallons specified in Section III, and the gallons actually delivered to PURCHASER pursuant to this Agreement.

It is further agreed that nothing herein contained shall prejudice the rights of either party to terminate this Agreement as hereinafter provided for and in the event the foregoing provision for liquidated damages is determined to be unenforceable for any reason, the party not in default shall not be precluded from exercising any other rights or remedies to which the party may be entitled under the terms of this Agreement or otherwise at law or equity."

According to NI-Gas' calculations, this section would limit ECI's recovery to a maximum of $13,576,002.30.

ECI responds that section 13 contains two conditions which must be satisfied before the liquidated damages clause may be invoked. ECI also argues that section 13 is presumed to be nonexclusive under section 2—719 of the Uniform Commercial Code (Ill. Rev. Stat. 1981, ch. 26, par. 2—719).

ECI interprets section 13 as being contingent upon a demand

for liquidated damages and termination pursuant to section 14 of the contract:

> "XIV. *Default and Termination*
>
> In the event either party is in default of any of its obligations hereunder, in addition to any other rights or remedies available at law or equity, the party not in default may cancel this Agreement by giving not less than thirty (30) Days prior written notice to the party in default; provided that such notice of default shall not be effective if the party claimed to be in default shall cure such default within thirty (30) Days after having received such notice. Any such termination shall be an additional remedy and shall not prejudice the rights of the party not in default to recover any amounts due it hereunder for any damage or loss suffered by it by virtue of such default, and shall not constitute a waiver of any other remedy to which the party not in default may be entitled for breach of this Agreement. Waiver of any defaults shall not be deemed a continuing waiver or a waiver of any subsequent default whether of the same or a different provision of this Agreement."

ECI argues that liquidated damages are not available because ECI (the nonbreaching party) did not terminate under section 14 and did not demand liquidated damages. We find that sections 13 and 14 do not have to be read together, nor may the nonbreaching party avoid the liquidated measure of damages simply by failing to make a demand.

Section 13 clearly provides that liquidated damages are available when the contract is terminated by default. It does not say that the contract must be terminated pursuant to section 14, which simply provides the nonbreaching party with a means of formally ending the contract while reserving the right to recover damages for the unperformed portion. An additional distinction between the two sections is found in the language of section 14 which states that "*** any such termination shall be an additional remedy and shall not prejudice the rights of the party not in default to recover any amounts due hereunder ***." This provision is inconsistent with any construction making termination pursuant to section 14 a prerequisite to recovery of liquidated damages. Section 14 is clearly an additional means of relief. This conclusion is also supported by similar language in section 13 stating that "*** nothing herein *** shall prejudice the rights of either party to terminate this agreement as hereinafter provided ***." Inclusion of this language in both section 13 and 14 convinces us that the parties did not intend that the availability of relief under one sec-

tion be conditioned on the operation of the other section.

■ ECI also contends that it has not made a demand for liquidated damages and, therefore, it has the option of seeking actual damages. Failure to demand a contractual right does not create rights greater than those bargained for. A liquidated damages clause is the agreement of the parties as to the amount of damages which must be paid in the event of default. (5 Corbin on Contracts sec. 1062, at 355-56 (1964).) Proof of liability is all that is required to entitle the injured party to recover the liquidated amount. (*Weiss v. United States Fidelity & Guaranty Co.* (1921), 300 Ill. 11.) If the nondefaulting party does not wish to demand this amount, he will not be forced to do so. But this does not create the right to seek a greater measure of damages than the amount bargained for.

Next, ECI relies on section 2—719(1)(b) of the Uniform Commercial Code, in arguing that the liquidated damages clause does not provide the exclusive measure of damages unless it is expressly agreed to be exclusive and labeled as such.

"Sec. 2—719. Contractual Modification or Limitation of Remedy. (1) Subject to the provisions of subsections (2) and (3) of this Section and of the preceding section on liquidation and limitation of damages,

(a) the agreement may provide for remedies in addition to or in substitution for those provided in this Article and may limit or alter the measure of damages recoverable under this Article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts; and

(b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy." Ill. Rev. Stat. 1981, ch. 26, par. 2—719.

There are no Illinois cases which address the question of whether section 2—719(1)(b) applies to a liquidated damages clause. Other authorities are split on the issue.

NI-Gas takes the position that section 2—719(b) applies only to contract provisions which limit a remedy. A liquidated damages clause does not limit a remedy but instead provides an agreed upon measure of damages. Therefore, section 2—719(b) does not govern the liquidated damages clause in the contract with ECI.

The only reported decision which addresses this precise issue is a North Dakota Supreme Court case. *Ray Farmers Union Elevator Co. v. Weyrauch* (N.D. 1975), 238 N.W.2d 47, involved the anticipatory breach of three grain supply contracts which contained liquidated

damage clauses. The plaintiffs claimed to have the option of seeking actual damages since the liquidated damage clauses were not declared to be exclusive as allegedly required by section 2—719(a)(b). The court rejected this argument holding that a liquidated damages clause is not a remedy within the portent of section 2—719. In accord with this decision is the commentary found in C. Bunn, H. Snead & R. Speidel, An Introduction to the Uniform Commercial Code 192 (1964), which characterizes section 2—719 as "*** primarily concerned with *what* remedies are available rather than the monetary amount of damage." (Emphasis in original.)

ECI makes no distinction between a remedy and a measure of damages in arguing that a liquidated damages clause is subject to section 2—719(1)(b). ECI relies on *Commonwealth Edison Co. v. Atlantic Richfield Co.* (No. 76L3951, N.D. Ill., filed June 15, 1978), where, in a memorandum opinion, the Federal District Court held that the liquidated damages clause of the contract did not limit the plaintiff's damages to the liquidated amount. The court found that the parties had inserted a provision into the contract which stated that liquidated damages were in addition to any other rights or remedies. Therefore, liquidated damages were optional. Although the court referred to 2—719(1)(b) in reaching its decision, its holding was based primarily on the express terms of the contract which made liquidated damages optional. We do not regard this as a definitive statement requiring liquidated damage clauses to comply with 2—719(1)(b) in order to be exclusive. We also note that this is an unpublished Federal trial court decision, which has no *stare decisis* effect in this court.

■ ECI also cites 6 D Willier & Hart, U.C.C. Reporter Digest sec. 2—719, at 2—666.58 (1983), which is critical of the majority opinion in *Weyrauch*. In this commentary, the authors point to section 1—201(34) of the code which defines "remedy" as "any remedial right to which an aggrieved party is entitled with or without resort to a tribunal." The authors contend that this definition is broad enough to encompass a liquidated damages clause. This is the same position taken by one dissenting justice in *Weyrauch*. For reasons which follow, we prefer the position taken by NI-Gas.

A liquidated damages clause which provides an agreed upon formula for calculating the amount of money damages owed in the event of nonperformance is not a limitation on a remedy. Liquidation or limitation of damages is governed by section 2—718; limitation of remedies falls under 2—719. The concepts are separate and distinct. The only cross reference between the two sections is found in 2—719 which states that it is "subject to" 2—718. If, instead, 2—718 were

made subject to 2—719, then the restrictions of 2—719(1)(b) would arguably apply to a liquidated damages clause. But the fact that 2—719 is subject to 2—718 indicates that any restriction on the right to liquidate damages by agreement is contained in 2—718 and nowhere else. We see no reason to impose the additional restraints of 2—719(1)(b).

■■ The trial court erred in finding that the liquidated damages clause did not prevent ECI from seeking an alternate measure of damages. The parties agreed to a liquidated sum a their damages in the event of default. This is often done in order to avoid the difficulty and uncertainty of proving damages by using market value, resale value or otherwise. Such an agreement is binding. Therefore, we reverse the court's order striking the liquidated damages defense. Because of our decision on this issue, it is not necessary for us to review NI-Gas' contention that the jury was improperly instructed on how to calculate ECI's damages.

THE AFFIRMATIVE DEFENSES

At trial, NI-Gas argued that its nonperformance was excused by: (1) the *force majeure* clause of the contract; (2) the doctrine of frustration of purpose and (3) sections 2—615 of the U.C.C. on excuse by failure of presupposed conditions.

Before trial, NI-Gas filed a motion for summary judgment on its defense based on the *force majeure* clause of the contract which provides in relevant part:

"*** In no event shall any liability result to either party for *** non-performance caused by circumstances beyond the control of the party affected, including but not limited to *** compliance with any law, regulation, requisition, request or direction made by any governmental authority *** or by reason of any similar or dissimilar causes ***."

The court denied the motion, granted ECI's motion to strike the *force majeure* defense and entered summary judgment for ECI. We affirm.

NI-Gas argues that an ICC rate order dated January 3, 1980, was the *force majeure* event which caused its nonperformance. We have reviewed the rate order and find that it did not direct NI-Gas to do anything which, on its face, was directly relevant or material to its performance of the contract with ECI. The operative portion of the rate order contains the following recitations:

"IT IS THEREFORE ORDERED by the Illinois Commerce Commission that the Filed Tariff Sheets referred to in Finding (15) be, and they are hereby, cancelled and annulled.

IT IS FURTHER ORDERED that the Filed Tariff Sheets

referred to in Finding (16) shall continue in effect.

IT IS FURTHER ordered the Respondent be, and it is hereby, ordered and directed to file for inclusion in its Schedule of Rates new sheets containing charges referred to in Finding (17), and all other terms remaining the same as currently in effect; said rates to become effective on the date of filing.

IT IS FURTHER ORDERED that Respondent be, and it is hereby, ordered and directed to file for approval with the Commission a cost of service study.

IT IS FURTHER ORDERED that all petitions, motions, and objections that remain undisposed of be, and the same are hereby, disposed of consistent with the ultimate conclusions contained herein.

By order of the Commission this 3rd day of January, 1980."

This is simply the commission's way of denying NI-Gas' request for a rate increase. Other than ordering NI-Gas to file additional paperwork, the order contains nothing which required NI-Gas to engage in a particular course of conduct.

NI-Gas argues that the following events, culminating in the termination of the contract with ECI, were the direct result of NI-Gas' efforts to "comply" with the rate order. The ICC had denied NI-Gas' request for a rate increase partly because the higher rate structure was based on a large amount of stored gas which was not necessary to meet the demands of NI-Gas customers. The ICC ruled that a lower amount of stored gas was sufficient and its costs could be covered by the existing rates. Since it could not increase its rates, NI-Gas felt compelled to curtail production of supplemental natural gas (SNG). In order to reduce SNG production, NI-Gas terminated the contract with ECI since this was its most expensive supplier of SNG feedstock. NI-Gas maintains that this situation is similar to that found in *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.* (5th Cir. 1976), 532 F.2d 957. We disagree.

Eastern Air Lines brought an action for breach of contract against McDonnell Douglas for excessive delays in delivering commercial airliners which Douglas had agreed to manufacture. The contract contained a provision regarding excusable delay which was essentially a *force majeure* clause. Douglas argued that the delays were excused by conditions caused by the Vietnam War. Due to wartime defense needs, the government had informally requested airline manufacturers to shift priority from civilian to certain military contracts. Compliance with these requests caused the delays in performance on the contract with Eastern. The trial court instructed the jury to consider only

those delays which were caused by formal government directives rather than the informal "jawboning" over government priorities. The jury found no excusable delay.

The Fifth Circuit Court of Appeals reversed, holding that the trial court's instruction was reversible error. Wartime conditions had resulted in government policies which the appeals court found to be fundamentally coercive. The court noted that airplane manufacturers had protested against additional changes in priority ratings under the Defense Production Act (DPA), arguing that such changes could cause shortages of scarce raw materials which would result in even greater delays on civilian contracts. The defense department agreed not to implement additional restrictions under the DPA but insisted that particular military contracts be given preference on an individual and informal basis. The appeals court found that the jury should have been allowed to determine whether any delays were proximately caused by compliance with the informal government requests.

In the present case we have neither a direct order nor an informal request. The rate order did not compel, suggest, or even recommend that NI-Gas act in any specific manner. It is true that the ICC approved the recommendation of its gas engineering staff that a lower amount of stored gas would be a reasonable level of inventory, but the order never directed NI-Gas to reduce its inventory. The net effect of the order was that NI-Gas could not raise its rates to cover the cost of unnecessary gas production.

■ Although NI-Gas felt that termination of the ECI contract was a commercially reasonable response to the rate order, we cannot say that NI-Gas was thereby complying with the order. By this we do not mean to say that in order to constitute a *force majeure* event, an ICC order or other utility regulation must specifically direct a party to breach an obligation. What is required is that the order clearly direct or prohibit an act which proximately causes nonperformance or breach of a contract.

■ The question of whether the rate order compelled NI-Gas to act involves interpretation of an administrative order which is a question of law for the court to decide. (See *Hulett v. Central Illinois Light Co.* (1980), 83 Ill. App. 3d 195, 197.) The trial court ruled against NI-Gas on this issue based on the undisputed facts contained in the ICC rate order of January 3, 1980. Summary judgment is appropriate where the pleadings and affidavits constitute all of the evidence before the court and upon such evidence, there is nothing left to go to the jury. (*Fooden v. Board of Governors* (1971), 48 Ill. 2d 580.) Since the rate order, as a matter of law, did not compel any per-

formance by NI-Gas, there was no question of fact as to whether NI-Gas' breach was proximately caused by compliance with the order as contemplated by the *force majeure* clause of the contract. Therefore, summary judgment was properly entered in favor of ECI.

NI-Gas contends that there are other *force majeure* events such as natural gas decontrol, escalating oil prices and other market conditions which excused its performance. These events were not presented to the trial court in connection with the motion for summary judgment and are waived. See *Smith v. Ashley* (1975), 29 Ill. App. 3d 932.

■ Next, NI-Gas argues that the trial court erred in granting ECI's motion for summary judgment on NI-Gas' frustration of purpose defense. In its reply to ECI's counterclaim, NI-Gas alleged as an affirmative defense that its nonperformance was justified by circumstances beyond its control that frustrated the purpose for which it had entered the contract.

Frustration of purpose, commercial frustration as the doctrine has been called in Illinois, is a viable defense but is not to be applied liberally. (*Smith v. Roberts* (1977), 54 Ill. App. 3d 910.) The *Smith* decision sets out a rigorous two-part test which requires a party to show that: (1) the frustrating event was not reasonably foreseeable; and (2) the value of counterperformance has been totally or nearly totally destroyed by the frustrating event.

NI-Gas argues that due to increases in natural gas supplies, its need for the naphtha produced by ECI was reduced. This factor, coupled with increased naphtha prices caused by rising crude oil prices plus the ICC rate order and other regulatory restraints destroyed the value of ECI's counterperformance. NI-Gas also contends that these events were unforeseeable and beyond its control.

First and foremost, as any trader knows, the only certainty of the market is that prices will change. Changing and shifting markets and prices from multitudinous causes is endemic to the economy in which we live. Market forecasts by supposed experts are sometimes right, often wrong, and usually mixed. If changed prices, standing alone, constitute a frustrating event sufficient to excuse performance of a contract, then the law binding contractual parties to their agreements is no more.

Moreover, we do not regard the events complained of by NI-Gas as unforeseeable. As early as 1972, NI-Gas executives were aware that demand for natural gas was being reduced due to consumer conservation caused by the OPEC oil embargo. Despite the fact that NI-Gas could not reasonably predict the future supply and demand of

natural gas beyond two or three years, NI-Gas entered into an agreement which required it to take 56 million barrels of naphtha over a period of at least 10 years. Furthermore, as a regulated public utility, NI-Gas should have known that the ICC might not grant all of its future requests for rate increases to cover costs generated by its performance of the contract with ARCO.

In 1976, NI-Gas and ECI negotiated the terms under which ECI would assume ARCO's rights and obligations under the naphtha supply contract. At this time, the nation was recovering from a crippling oil embargo by OPEC nations. Fully aware of how oil prices had behaved in the past, NI-Gas agreed to an amended price escalation formula which specified that the contract price for naphtha would increase at a rate 1.4 times any increase in crude oil costs. NI-Gas agreed to this amendment despite the fact that in 1974, the chairman of the board of NI-Gas was publically predicting that by the mid-1980's, crude oil prices would be in the range of $32 to $35 a barrel. As predicted, crude oil prices rose to about $31 per barrel by late 1979.

Thus, in 1973 when the contract was formed and in 1976 when the contract was assigned to ECI, NI-Gas was aware of the potential for adverse market shifts which now form the basis for its defenses based on impracticability and frustration of purpose. At either time, NI-Gas could have included specific terms in the contract to provide relief when these events came to pass. NI-Gas failed to do so.

The facts which constitute the frustrating events complained of by NI-Gas are not in dispute and the record clearly demonstrates that these events were, to a large degree, foreseeable to NI-Gas and in some cases predicted by NI-Gas. Applying these facts to the test set out in the *Smith* decision, there is no room for a difference of opinion. As a matter of law, NI-Gas was unable to show that the supposed frustrating events were not reasonably foreseeable. Therefore, the defense of commercial frustration was not available to NI-Gas, and summary judgment was properly entered in favor of ECI.

■ The next defense raised by NI-Gas is based on section 2—615 of the Uniform Commercial Code:

"Sec. 2—615. Excuse by Failure of Presupposed Conditions. Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance:

(a) Delay in delivery or non-delivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance

as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.

(b) Where the causes mentioned in paragraph (a) affect only a part of the seller's capacity to perform, he must allocate production and deliveries among his customers \*\*\*." (Ill. Rev. Stat. 1981, ch. 26, par. 2—615.)

At the close of the evidence, the trial court directed a verdict for ECI on this defense.

The trial court apparently based its ruling on the fact that NI-Gas failed to show that it had allocated its performance reductions among its three suppliers of SNG feedstock as required by 2—615(b). We express no opinion as to whether this was a proper basis for the directed verdict since we find the ruling to be correct for other reasons.

We preface our comments by noting that section 2—615 by its terms applies only to sellers. However, comment 9 thereunder indicates that its provisions are equally applicable to buyers so long as they comply with all of the statutory requirements. (Ill. Ann. Stat., ch. 26, par. 2—615, Uniform Commercial Code Comment 9, at 501 (Smith-Hurd 1963).) The trial court permitted NI-Gas, as a buyer, to invoke 2—615 provided that all elements of the defense were satisfied. We agree with that ruling but find that NI-Gas failed to establish a *prima facie* case under 2—615.

A directed verdict is proper when all of the evidence, viewed favorably to the nonmovant, so overwhelmingly favors the movant that a contrary verdict could not stand. The evidence in the case at bar overwhelmingly demonstrates that NI-Gas failed to prove that its performance was made impracticable by an event, the nonoccurrence of which was a basic assumption on which the contract was formed. NI-Gas also failed to demonstrate that degree of impracticability necessary to excuse performance.

In order to prevail on this defense, NI-Gas had to show that the contract was based on the assumption that oil prices would not rise drastically, that demand for natural gas would not decline and that NI-Gas would be permitted to raise its rates in order to cover its costs. The terms of the contract and the evidence at trial do not support this proposition.

The question of whether the nonoccurrence of an event was a basic contract assumption is a question of foreseeability. (*Eastern Air*

*Lines, Inc. v. Gulf Oil Corp.* (S.D. Fla. 1975), 415 F. Supp. 429.) As we have stated in our analysis of the commercial frustration defense, adverse shifts in oil and gas prices were foreseeable and NI-Gas was charged with knowledge that it might not always be able to raise its rates.

In addition, NI-Gas specifically agreed to take or pay for naphtha thus guaranteeing performance regardless of the demand for SNG. The record reveals that NI-Gas understood this provision to mean that it was obligated to pay for the product whether it was delivered and used or not. According to ECI, this is the meaning of a take or pay provision which is generally accepted in the petroleum and natural gas industry. Such a provision belies any assertion that the contract was based on the assumption that the buyer would have a continuing need for the sellers product, especially when inserted into a long-term supply contract such as this one.

The contract also contained a price escalation formula which based the contract price for naphtha on the price of crude oil. This formula guaranteed that the contract would remain profitable for ECI and indicates that the risk of increased naphtha prices due to increased crude oil prices (which were foreseeable) was shifted to NI-Gas. See *Eastern Airlines, Inc. v. Gulf Oil Corp.* (S.D. Fla. 1975), 415 F. Supp. 429.

NI-Gas also failed to demonstrate a sufficient degree of impracticability. The impracticability complained of by NI-Gas was the substantial increase in the cost of its performance. Even if we had concluded that the events leading to the increased cost were events which the contracting parties assumed would not occur, increased cost does not usually constitute impracticability under section 2—615.

Comment 4 to section 2—615 states that "[i]ncreased cost alone does not excuse performance unless the rise in cost is due to some unforeseen contingency which alters the essential nature of the performance." (Ill. Ann. Stat., ch. 26, par. 2—615, Uniform Commercial Code Comment 4, at 500 (Smith-Hurd 1963).) The essential nature of NI-Gas' performance under the contract was to take or pay for naphtha. What NI-Gas was to do with the naphtha was not specified by the contract. In fact, prior to terminating the contract, NI-Gas had begun to resell the naphtha on the open market and negotiated with ECI to obtain an amendment to the contract which would facilitate such sales.

When its application for a rate increase was denied, NI-Gas decided it would cost less to terminate the agreement that to continue to perform by whatever means possible. A party is expected to use

reasonable efforts to surmount obstacles to performance and performance is impracticable only if it is so in spite of such efforts. (Restatement (Second) of Contracts sec. 261 (1961).) A party seeking to excuse his performance must show that he can operate *only* at a loss and that the loss will be so severe and unreasonable that failure to excuse performance would result in grave injustice. (*Gulf Oil Corp. v. Federal Power Com.* (3d Cir. 1977), 563 F.2d 588.) NI-Gas has made no such showing. Instead, the evidence overwhelmingly favors the opposite conclusion. Accordingly, we affirm the directed verdict for ECI on this issue.

■■ NI-Gas' final defense was based on allegations of fraud and lack of good faith by ECI in the performance of the contract. The court granted summary judgment for ECI. NI-Gas relies on section 1—203 of the Uniform Commercial Code (Ill. Rev. Stat. 1981, ch. 26, par. 1—203), which imposes an obligation of good faith in the performance or enforcement of a contract. A party's lack of good faith in the performance of an obligation can serve as a defense to that party's claim for damages. (See *Toppert v. Bunge Corp.* (1978), 60 Ill. App. 3d 607.) NI-Gas contends that before the contract was terminated, ECI breached its obligations of good faith, thus barring ECI's claim for damages due to NI-Gas' conduct.

NI-Gas alleges two separate acts by ECI which show lack of good faith. First, NI-Gas charges that ECI deliberately inflated the price it was charged for crude oil and then used that price to overcharge NI-Gas for naphtha shipments in the amount of $3,349,932. ECI does not dispute this amount and admits that NI-Gas was overcharged. ECI consented to a judgment against it for this amount but denies that the overcharge was deliberate or the result of bad faith performance. NI-Gas also accuses ECI of covering up the overcharge. NI-Gas did not discover the overcharge until approximately 29 months after it terminated the agreement.

ECI argues that the overcharge was a normal result of the billing procedure adopted by the parties. The contract price for naphtha was based on ECI's crude oil costs. Such costs could not be determined until several months after naphtha deliveries were made due to late and revised billings by ECI's crude suppliers and various retroactive Federal price programs. Accordingly, ECI and NI-Gas followed a standard practice of invoicing deliveries at a quarterly estimated price with a retroactive adjustment several months later when ECI's actual crude oil costs finally could be determined. The adjustments went both ways, sometimes resulting in a credit and other times a debit to NI-Gas' account. For example, the adjustment for the quarter preced-

ing NI-Gas breach (October-December 1979) reflected the fact that NI-Gas had been underbilled by more than $4 million. NI-Gas was not invoiced for this adjustment until March 24, 1980, almost four months after the end of the quarter.

These same billing procedures were followed during the quarter when NI-Gas repudiated (January-March 1980). In December 1979, ECI notified NI-Gas of the estimated price for the quarter and NI-Gas was invoiced for deliveries in January, February and March 1980 at that estimated price. ECI's actual crude oil costs for the first quarter of 1980 could not be determined until long after NI-Gas' repudiation and the filing of this action on March 17, 1980. Those actual costs resulted in a credit to NI-Gas of $3,349,932.

NI-Gas states that during the first quarter of 1980, ECI based its price for naphtha on an estimated crude oil price of $31 per barrel. NI-Gas contends that this price was deliberately inflated because ECI, in a sworn filing with the Department of Energy (DOE), stated that its crude oil price would be only $27 per barrel. This alleged discrepancy, according to NI-Gas, shows bad faith on the part of ECI. We disagree.

· Actually, ECI informed the DOE that its crude oil price would be $27 per barrel *if it received a DOE allocation.* This is an important condition. Since no allocation had been received when NI-Gas was billed for the first quarter of 1980, there was no reason for ECI to reduce its estimated price of $31 per barrel. ECI was not required to regard the DOE allocation as a certainty simply because it had received such allocations on two prior occasions.

In support of its allegation of a coverup, NI-Gas points to the fact that after the contract was terminated, ECI was aware of the overcharge (although not the precise amount), but never came forward to make an adjustment. Even if this allegation were true, it would not constitute a lack of good faith in performance of the contract since the alleged coverup occurred after the contract had been unilaterally terminated by NI-Gas. After NI-Gas revealed its intention to repudiate the agreement, ECI was permitted to suspend its performance. (Ill. Rev. Stat. 1981, ch. 26, par. 2—610.) Thus, this situation can be distinguished from cases cited by NI-Gas which permit a party to defend based on conduct occurring before repudiation but not discovered until afterwards. (See, *e.g., College Point Boat Corp. v. United States* (1925), 267 U.S. 12, 15-16, 69 L. Ed. 490, 493, 45 S. Ct. 199, 200-01.

For these reasons, we find that NI-Gas' allegations of bad faith and fraud have no legal or factual basis and we affirm the trial court's entry of summary judgment in favor of ECI.

THE COURT'S EVIDENTIARY RULINGS

■■ NI-Gas contends that the trial court erred in granting ECI's motion *in limine* to exclude all reference to NI-Gas' statutory and regulatory obligations as a public utility. NI-Gas presents this issue as if the very existence of such regulations provide an excuse for its breach. They do not. Although the regulations may explain why NI-Gas refused to perform, they are immaterial and provide no excuse unless presented in the context of a recognized defense. When, as here, an opposing party raises a challenge to the legal sufficiency of a defense grounded upon frustration of purpose or commercial impracticability, statutory obligations should be given the same consideration as other external events alleged in support of the defense. They do not confer a privileged status on one who is affected by them, nor do they act to broaden the availability of defenses which excuse nonperformance.

■■ Two of the defenses raised by NI-Gas, *force majeure* and frustration of purpose, were properly disposed of by summary judgment before any evidence was presented to the jury. Therefore, the regulatory and statutory obligations of NI-Gas were material only as to its remaining defense based on section 2—615 of the commercial code, which was disposed of by a directed verdict for ECI at the close of the evidence. The fact that NI-Gas was unable to refer to its obligations as a utility in presenting this defense was not prejudicial. Statutory and regulatory restrictions provide a defense under section 2—615 only. if their operation or nonoperation were a basic assumption underlying the contract. Since we have already found that these factors did not support a section 2—615 defense, the court's order excluding this evidence was harmless error.

NI-Gas argues that the court erred in permitting ECI to make references at trial to NICOR, Inc., NI-Gas' parent company. NI-Gas contends that ECI portrayed NICOR as a greedy energy conglomerate which expected to reap the rewards of increased prices from gas decontrol but then attempted to use those same conditions as a means of breaking a contract which had become unprofitable. According to NI-Gas, ECI contrasted this picture of NICOR against the image of ECI as the representative of "half a million farm families." We have reviewed the record and find that NI-Gas has ignored the purpose this evidence was put to.

■■ One of the issues in this case was whether NI-Gas could invoke section 2—615 as a defense to nonperformance. ECI presented evidence showing that Ni-Gas' chairman, along with representatives of NICOR, fully supported and argued in favor of the removal of Fed-

eral regulation of natural gas prices. This evidence tended to show that NI-Gas had foreseen and encouraged some of the events which allegedly made its performance impracticable. Thus, this evidence was both relevant and material and was properly admitted.

▮▮ Finally, NI-Gas argues that it was prejudiced by the court's order *in limine* which prevented NI-Gas from referring to or identifying the source of the retroactive billing adjustment which resulted in the judgment in favor of NI-Gas for $3,349,932.

Mr. Edward J. Filiatrault, the executive vice-president of NI-Gas, testified that NI-Gas was forced to terminate the contract with ECI in part because ECI's SNG feedstock was inordinately more expensive than both pipeline gas and other sources of SNG feedstock. In the course of his testimony, Mr. Filiatrault laid the foundation for a chart listing the price of various feedstocks and pipeline gas. The chart was based in part on the price billed to NI-Gas by ECI for naphtha supplied during the first quarter of 1980, because that price was a substantial reason for NI-Gas' decision to terminate the contract.

ECI objected to the admission of the chart, claiming that it was inaccurate because it did not account for the $3 million overcharge which ECI had conceded that it owed NI-Gas. NI-Gas responded that the chart accurately portrayed the situation confronting NI-Gas at the time of termination, but the trial court sustained ECI's objection and ordered the exhibit stricken. The court ruled that the exhibit would be admitted only if NI-Gas corrected the error and then reintroduced the exhibit.

While cross-examining Mr. Filiatrault, ECI's counsel stressed the fact that the exhibit had been based on a price figure which was too high. NI-Gas argues that it was prejudiced because it could not rehabilitate this witness by identifying ECI as the source of the erroneous figure.

As NI-Gas admits, this evidence was offered to show that it was forced to terminate the contract due to the expense of ECI's naphtha. If, in fact, the credibility of this witness and his testimony was diminished in the eyes of the jury due to ECI's cross-examination and the inability of NI-Gas to effectively rehabilitate on redirect, prejudice would result only if NI-Gas had been able to utilize defenses which were grounded on this evidence. Since we have affirmed the trial court's rulings which eliminated NI-Gas' affirmative defenses, any error in striking the exhibit or in preventing NI-Gas from identifying the source of the billing adjustment was harmless.

To summarize our decision, we reverse the judgment of the circuit court of Grundy County granting ECI's motion to strike the defense

based on the liquidated damages clause of the contract. The jury's award of damages in the amount of $305.5 million is vacated and the cause is remanded for determination of ECI's damages according to the formula contained in the liquidated damages clause. In all other respects, the judgment is affirmed.

Affirmed in part; reversed in part; remanded with directions.

STOUDER, P.J., and BARRY, J., concur.