**COMDISCO DISASTER RECOVERY SERVICES, INC., Plaintiff,**

v.

**MONEY MANAGEMENT SYSTEMS, INC., Defendant.**

Civ. A. No. 90–11257–S.

United States District Court,
D. Massachusetts.

Feb. 28, 1992.

---

Peter A. Johnson, Lane & Altman, Boston, Mass., for Comdisco Disaster Recovery Services, Inc.

Sandra E. Lundy, Choate, Hall & Stewart, Boston, Mass., James P. Golden, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., Eric A. Deutsch, Testa, Hurwitz & Thibeault, Boston, Mass., for Money Management Systems, Inc.

## MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

SKINNER, District Judge.

This diversity action arises out of a contractual dispute between plaintiff Comdisco Disaster Recovery Services, Inc. ("CDRS"), an Illinois corporation, and Money Management Systems, Inc. ("Money Management"), a Delaware corporation with its principal place of business in Massachusetts. Plaintiff alleges that a valid contract for the provision of disaster recovery services exists between plaintiff and defendant, and that defendant breached the agreement by defaulting on its monthly payment obligations. Defendant admits that plaintiff had been performing adequately under the contract, but argues that it should be excused from all contractual liability because an essential purpose of the contract has been frustrated and enforcement of the contract may violate public policy. Contending that defendant's affirmative defenses are insufficient as a matter of law, plaintiff moves for summary judgment pursuant to Fed.R.Civ.P. 56.

■■■ Summary judgment is warranted only if the moving party can show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c). Where the movant has met this initial burden, summary judgment should be granted, unless the opponent establishes the existence of a genuine issue of fact by credible evidence in the record that would be admissable at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Material facts are those that might affect the outcome of the litigation under the applicable substantive law. *Id.*

### Background

On March 16, 1988 CDRS and Money Management entered into a contract whereby CDRS would provide disaster recovery services to Money Management for a period of five years in consideration for a monthly subscription fee and certain contingency fees. Under disaster recovery contracts like the one at issue, the vendor (CDRS) is obligated to maintain fully operational computer centers, known as "hot sites", as a back-up for customers whose businesses are dependent on computers. A disaster recovery customer (Money Management) pays a monthly subscription fee for the assurance of having access to a hot site both for testing days and for performing actual operations in case a disaster (such as a fire, earthquake, or power failure) incapacitates the customer's computers. Should a subscriber choose to exercise his option to use a hot site in the event of a disaster, he must pay a disaster notifi-

cation fee as well as a daily usage fee. The five year agreement signed by Money Management and CDRS provides that Money Management pay an original monthly subscription fee of $2,250.00, to be increased by no more than 6% per year, a disaster notification fee of $15,000.00 per disaster, and a daily usage fee of $8,000.00 per day for actual use of a CDRS hot site in the event of a disaster.

On June 29, 1989, Money Management was acquired by SunGuard Data Systems, Inc. ("SunGuard Data") and became a wholly owned subsidiary. Another subsidiary that SunGuard Data owned at the time, and continues to own, is SunGuard Recovery Services, Inc. ("SunGuard Recovery"). SunGuard Recovery is a chief competitor of CDRS in the disaster recovery services field. That same month, Money Management stopped paying the monthly subscription fee to CDRS for disaster recovery services. On September 25, 1989, SunGuard Recovery signed an agreement with its new corporate sibling, Money Management, for the provision of disaster recovery services similar to those Money Management had been receiving from CDRS.

In a letter dated March 23, 1990, CDRS formally notified Money Management that its failure to make monthly payments since June, 1989 was a default under the contract. Pursuant to ¶ 11(B) of the contract, Money Management had ten days from receipt of the default notice to cure its default by paying out all amounts past due, plus interest. On April 11, 1990, after Money Management failed to effect a cure within the allotted time, CDRS notified Money Management of CDRS's election to immediately terminate the agreement and accelerate all of the remaining monthly payments under ¶ 11(B) of the contract. CDRS demanded a total of $114,861.60, plus interest at the rate of 18% per year pursuant to the contract.

On May 10, 1990, CDRS filed its complaint in this action in five counts, alleging breach of contract, services rendered, quantum meruit, account stated, and a claim that Money Management's actions constitute unfair and deceptive trade practices pursuant to M.G.L. c. 93A § 11.

Money Management refuses to pay the accelerated amount as demanded by CDRS. In its answer, Money Management admits that though April 11, 1990, CDRS performed adequately under the contract, but claims that the purpose of the contract was frustrated when SunGuard Data acquired ownership of Money Management. Money Management asserts that CDRS and its parent company Comdisco, Inc. ("Comdisco"), have unfairly competed with SunGuard Data and SunGuard Recovery over the past ten years, and were Money Management forced to rely on back up computer capability provided by CDRS, Money Management also would be at risk of unfair competition by CDRS and Comdisco. Money Management claims that it is virtually impossible for a disaster recovery customer to prevent its disaster recovery vendor from gaining access to its proprietary software and confidential data during a test or disaster, and that CDRS would use its access to Money Management's materials in the event of a disaster to continue CDRS's and Comdisco's alleged unfair competition against SunGuard Recovery and SunGuard Data.

Although not set forth in its answer or counterclaim, Money Management argues that another frustrating event is the fact that CDRS's contract allegedly no longer provides adequate disaster recovery backup to Money Management. Money Management admits it did not realize until 1990 that the backup capability specified in the CDRS contract would no longer be sufficient for Money Management's needs.

Lastly, Money Management posits that performance under the contract might violate the United States antitrust laws and therefore public policy, because CDRS and SunGuard Recovery occupy prominent positions in the disaster recovery industry, and both potentially would have access to nonpublic information about the other. In effect, Money Management claims that performance under the contract should be excused under the doctrine of impossibility, as applied by Illinois courts. The argu-

ment is that because performance might constitute illegal activity, it is constructively impossible for either party to continue performing under the contract.

Pursuant to 28 U.S.C. § 2201, Money Management counterclaims for a declaratory judgment that an essential purpose of the CDRS–Money Management contract has been frustrated, that the contract was void and unenforceable as of the June 29, 1989 acquisition of Money Management by SunGuard Data, or that the contract is in effect but must be modified to protect the confidentiality of Money Management and SunGuard Data. Alternatively, if Money Management is liable to CDRS, Money Management requests a declaration that CDRS's acceleration of payments due was improper and unconscionable, because the resulting liquidated damages were not reasonable in light of CDRS's anticipated or actual loss. Money Management also seeks a declaration that the contractual provision for 18% interest on all past due amounts is unconscionable.

On June 14, 1990, Money Management tendered $31,434.30 to CDRS in back payments without prejudice to the resolution of the litigation. Each month since then Money Management has tendered an amount purporting to be the monthly charge, also without prejudice. CDRS has repeatedly rejected the tendered funds, instead demanding the entire accelerated amount due, plus interest.

*Discussion*

■■■ A federal district court sitting in a diversity action must apply the conflicts of law principles of the state in which that federal court resides. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Paragraph 13(B) of the contract provides that it "shall be governed by the laws of the State of Illinois." Massachusetts courts generally uphold choice of law provisions so long as there is no serious conflict with the public policy of Massachusetts and the designated state has some substantial relation to the contract. *See Morris v. Watsco, Inc.*, 385 Mass. 672, 433 N.E.2d 886, 888 (1982) (citing *Steranko v.*

*Inforex, Inc.*, 5 Mass.App.Ct. 253, 270, 362 N.E.2d 222, 228 (1977)); *Wellons v. Numerica Sav. Bank, FSB*, 749 F.Supp. 336, 337 n. 3 (D.Mass.1990). As neither party has argued that the application of Illinois law would seriously conflict with public policy, or that Illinois lacks substantial relation to the contract, the parties will be bound by their choice of Illinois law to govern this dispute. *See Steranko*, 5 Mass.App.Ct. at 270, 362 N.E.2d at 228.

■■■ Under well established Illinois law, the general rule is that where the "parties, by their own contract and positive undertaking, create a duty or charge upon themselves, they must abide by the contract and make the promise good, and subsequent contingencies, not provided against in the contract, which render performance impossible, do not bring the contract to an end." *Leonard v. Autocar Sales & Service Co.*, 392 Ill. 182, 187, 64 N.E.2d 477, 479 (1945). *See also American National Bank v. Richoz*, 189 Ill.App.3d 775, 136 Ill.Dec. 1026, 1029, 545 N.E.2d 550, 553 (1989); *Mouhelis v. Thomas*, 95 Ill.App.3d 181, 183, 50 Ill.Dec. 688, 419 N.E.2d 956 (1981). An exception to this general rule is the affirmative defense of impossibility, where "the continued existence of a particular person or thing is so necessary to the performance of a contract that, by law, it is implied as a condition of the contract that the death of that person or thing shall excuse performance." *American National Bank*, 189 Ill.App.3d 775, 136 Ill.Dec. at 1029, 545 N.E.2d at 553 (citations omitted).

■■■ An extension of the impossibility defense is the doctrine of commercial frustration. *See Leonard*, 392 Ill. 182, 64 N.E.2d at 480. First recognized by the Illinois Supreme Court in the *Leonard* decision, the standard for applying the frustration doctrine was clarified by subsequent cases like *Greenlee Foundries, Inc., v. Casting Masters, Inc.*, 13 Ill.App.3d 611, 619, 301 N.E.2d 106, 111 (1973). The *Greenlee Foundries* court adopted the following rigorous test:

'[A] promisor seeking to excuse himself from performance of his obligations [must] prove that the risk of the frustrat-

ing event was not reasonably foreseeable and that the value of counterperformance is totally or nearly totally destroyed, for frustration is no defense if it was foreseeable or controllable by the promisor, or if counterperformance remains valuable.' *Id.* (quoting *Lloyd v. Murphy,* 25 Cal.2d 48, 50, 153 P.2d 47 (1944)). The above test has been widely followed by other Illinois Courts. *See, e.g., Smith v. Roberts,* 54 Ill.App.3d 910, 12 Ill.Dec. 648, 650, 370 N.E.2d 271, 273 (1977); *American National Bank,* 189 Ill.App.3d 775, 136 Ill.Dec. at 1029, 545 N.E.2d at 553 (citing *Smith,* 54 Ill.App.3d 910, 12 Ill.Dec. at 650, 370 N.E.2d at 273 and *Northern Illinois Gas Co. v. Energy Cooperative, Inc.,* 122 Ill. App.3d 940, 78 Ill.Dec. 215, 225, 461 N.E.2d 1049, 1059 (1984)).

While the defense of commercial frustration remains viable in Illinois, it is not to be applied liberally. *Northern Illinois Gas Company,* 122 Ill.App.3d 940, 78 Ill.Dec. at 225, 461 N.E.2d at 1059 (citing *Smith v. Roberts,* 54 Ill.App.3d 910, 12 Ill.Dec. 648, 370 N.E.2d 271 (1977)). " 'The doctrine of frustration has been limited to cases of extreme hardship so that businessmen, who must make their arrangements in advance, can rely with certainty on their contracts.' " *Greenlee Foundries, Inc.,* 13 Ill. App.3d at 619, 301 N.E.2d at 111 (citation omitted).

Although not stated in the CDRS–Money Management contract, Money Management asserts that "a basic assumption on which the contract was made is that performance should not endanger Money Management's or its corporate affiliates' businesses and should not give an opportunity to [CDRS] to commit unfair competition and related acts." Money Management argues that this purpose was frustrated by its acquisition by SunGuard Data, and that this frustrating event was not reasonably foreseeable at the time the parties entered into the contract. In addition, Money Management argues that the value of CDRS's performance after the SunGuard Data acquisition has been totally or nearly totally destroyed by the alleged frustrating event.

Money Management's affirmative defense of commercial frustration fails as a matter of law. Even assuming for purposes of this motion that Money Management's characterization of an essential purpose of the contract is correct, the doctrine of frustration is not applicable because the alleged frustrating event was controllable by the promisor and reasonably foreseeable. In addition, the value of the agreement has not been totally or nearly totally destroyed.

Money Management admittedly helped bring about Money Management's acquisition by SunGuard Data. Neither Illinois courts nor Massachusetts courts will apply the doctrine of frustration to excuse a party from its contractual obligations where that party contributed to, or had control over, the occurrence of the alleged frustrating event. *See Greenlee Foundries, Inc.,* 13 Ill.App.3d at 619, 301 N.E.2d at 111 (quoting *Lloyd v. Murphy,* 25 Cal.2d 48, 50, 153 P.2d 47 (1944)); *Chase Precast Corp. v. John J. Paonessa Co.,* 409 Mass. 371, 375, 566 N.E.2d 603, 606 (1991) (citing Restatement (Second) of Contracts, § 265). *Cf. Felbinger and Co. v. Traiforos,* 76 Ill.App.3d 725, 733, 31 Ill.Dec. 906, 394 N.E.2d 1283 (1979) (construing the doctrine of impossibility, out of which the doctrine of frustration evolved, and holding that a "duty will not be discharged by judicial action if there are circumstances showing a contrary intention or contributing fault on the part of the person subject to the duty"); *M.A. Felman Co. v. Wjol, Inc.,* 104 Ill. App.2d 66, 72–73, 243 N.E.2d 33, 36–37 (1968) (construing the defense of impossibility in cases where laws or regulations make performance illegal, and holding that "such illegality must not have come about because of any action or non-action on part of either of the parties to the contract").

Even if the allegedly frustrating event is restated as the post-acquisition risk that CDRS will unfairly compete with Money Management by accessing, studying, and copying Money Management's software and confidential information, the frustrating event was still reasonably foreseeable. Paragraph 10 of the contract provides:

**54**

CDRS and Customer shall each exercise the same standard of care to protect any proprietary or confidential data of the other, disclosed during negotiation or performance of this Agreement, as is used to protect its own proprietary or confidential data from unauthorized disclosures. If Customer has any special means of protecting such data, it shall in writing so inform CDRS who will use its best efforts to utilize such means to protect said data. . . .

The above paragraph clearly forewarns both parties that each will have access to the proprietary and confidential data of the other during the performance of the contract.

Paragraph 10 of the contract also imputes to Money Management the understanding that CDRS undertook no contractual obligation to use special means of protecting Money Management's data, unless CDRS was provided with such special means by Money Management, and CDRS was notified that such special measures were to be implemented. Money Management provided neither special means nor notification to CDRS. Nor did Money Management provide CDRS with notice of an alleged default by CDRS (as required by ¶ 11(B) of the contract) before discontinuing the monthly payments. Where the frustrating event "might have been anticipated or guarded against in the contract, the parties shall be held to any unqualified undertaking set forth in the contract." *Mouhelis*, 95 Ill.App.3d 181, 50 Ill.Dec. at 691, 419 N.E.2d at 959 (citing *Leonard*, 392 Ill. at 189, 64 N.E.2d at 480). Because the contract anticipated the possibility that CDRS might want special protection from risks entailed by the parties' mutual access to confidential and proprietary information of the other, I hold that any such frustrating event was also reasonably foreseeable.

In addition, the value of CDRS's performance has not been totally or nearly totally destroyed. Even with the alleged risk of CDRS studying Money Management's files in the event of a disaster, Money Management would still have the substantial benefit of backup computer capability that would allow it to continue operating its business until it got its own computers running again. Money Management's continuing need for such disaster recovery services after its acquisition by SunGuard Data is evidenced by the subsequent agreement for disaster recovery services that Money Management entered into with SunGuard Recovery.

Money Management's other arguments for excusing its contractual obligations with CDRS are also insufficient. Money Management's purported realization in 1990 that the CDRS contract would no longer provide adequate disaster recovery backup does not qualify as a frustrating event, because such a contingency was anticipated by the parties in the contract itself. Paragraph 2(A) specifies that, "Customer will obtain and maintain, at its sole expense, any necessary equipment not included in the CDRS Backup Capability. . . ." Thus, Money Management's late "realization" that CDRS's disaster recovery services might be inadequate for Money Management's purposes was reasonably foreseeable. *See Mouhelis*, 95 Ill.App.3d 181, 419 N.E.2d at 959 (citation omitted).

Money Management's attempt to raise the defense of impossibility because performance under the contract might be illegal is similarly unavailing. Under the doctrine of impossibility, "such illegality must not have come about because of any action or non-action on part of either of the parties to the contract." *M.A. Felman Co.*, 104 Ill.App.2d at 72–73, 243 N.E.2d at 36–37. Here any potential illegality under the antitrust laws was brought about by Money Management because it admittedly participated in its acquisition by SunGuard Data. Thus, the defense of impossibility is not applicable.

On the issue of damages, Money Management argues that even if it breached the contract there was no basis for CDRS's acceleration of monthly payments under the contract, and that CDRS's attempt to do so and then charge 18% interest is unconscionable. Under the contract, Money Management's failure to cure a delinquent payment within ten days after

written notice of a default entitles Comdisco to terminate the contract and immediately accelerate the future monthly fees remaining under the contract. Contract, ¶ 11(B). Money Management received written notice of its default by letter dated March 23, 1990. After Money Management failed to cure within the time allotted, CDRS notified Money Management of its election to terminate the contract and accelerate the monthly payments pursuant to ¶ 11(B). Because the acceleration clause was negotiated at arm's length by two sophisticated corporations and the claimed unconscionability arose after the contract was executed, *see, e.g., Walter E. Heller & Co., Inc., v. Convalescent Home of First Church of Deliverance*, 49 Ill.App.3d 213, 220–21, 8 Ill.Dec. 823, 365 N.E.2d 1285 (1977); Ill.Rev.Stat. ch. 26, para. 2–302 (1991); J. White and R. Summers, *Handbook of the Law Under the Uniform Commercial Code* 114–15 (1972), and because Money Management failed to take advantage of the contractual cure provisions, *see Continental Illinois Nat'l Bank & Trust Co. v. East Illinois Water Co.*, 31 Ill. App.3d 148, 157, 334 N.E.2d 96, 104 (1975), I hold that the acceleration clause was not unconscionable. For the same reasons I hold that the contractual interest rate of 18% "[w]henever any payment is not made when due", Contract ¶ 5, is not unconscionable.

■ Nor should the acceleration clause of ¶ 11(B) be construed as a penalty, as opposed to a liquidated damages clause. Under Illinois law, "It is axiomatic that a predetermined damages clause will be given effect if the actual damages are difficult to ascertain and the liquidated damages provision is a reasonable estimate of the damages which would actually result from a breach of contract." *Hayden v. Keepper–Nagel, Inc.*, 62 Ill.App.3d 828, 19 Ill. Dec. 601, 603, 379 N.E.2d 116, 118 (1978) (citations omitted). "A party seeking to enforce a liquidated damages clause does not need to present evidence of his actual damages." *Arduini v. Bd. of Education*, 93 Ill.App.3d 925, 49 Ill.Dec. 460, 465, 418 N.E.2d 104, 109 (1981) (citing *Hayden*, 62 Ill.App.3d 828, 19 Ill.Dec. at 603, 379

N.E.2d at 118), *rev'd on other grounds, Arduini v. Board of Education*, 92 Ill.2d 197, 65 Ill.Dec. 281, 441 N.E.2d 73 (1982). At the time the parties entered into the contract, the amount of revenue CDRS could expect to derive in disaster notification and usage fees was sufficiently uncertain to make the actual damages from a breach difficult to determine. As the acceleration clause provides a reasonable estimate of the damages which would actually result from a breach of contract, I hold as a matter of law that the acceleration clause constitutes an enforceable liquidated damages provision. *See Hayden*, 62 Ill.App.3d 828, 19 Ill.Dec. at 603–04, 379 N.E.2d at 118–19.

Because Money Management's affirmative defenses of commercial frustration and impossibility fail as a matter of law, there are no genuine disputes remaining as to any material facts as to counts I of the complaint. Nor would any genuine disputes as to material facts likely arise if this court compelled CDRS to provide additional discovery. Because Money Management admits that CDRS adequately performed under the contract up until April 11, 1990, the time at which CDRS terminated the contract and accelerated the monthly payments due thereunder, and Money Management's affirmative defenses fail as a matter of law, no further discovery is warranted as to the controlling facts. Counts II, III, and IV allege causes of action based on the same set of facts as count I, but are inconsistent with an action on the contract itself. They are accordingly dismissed.

■ Another count of the complaint that does not merit summary judgment for CDRS is count V. In count V, CDRS alleges that Money Management's actions constitute unfair and deceptive trade practices pursuant to M.G.L. c. 93A § 11. Because Illinois law, and not Massachusetts law, governs the parties' dispute, CDRS is not entitled to assert a Massachusetts statutory claim under c. 93A § 11. As such, count V of CDRS's complaint must be dismissed as a matter of law.

**56**

Accordingly, CDRS's motion for summary judgment is allowed with respect to Money Management's counterclaim and count I of the complaint. Counts II–V of the complaint are hereby dismissed.

Judgment for the plaintiff shall be entered in the amount of $114,861.60, plus agreed upon interest of 18%, and costs.