FOURTH DIVISION

  June 24, 2004

1-02-3884

FLEET BUSINESS CREDIT, LLC, a Delaware ) Appeal from the

Limited Company, ) Circuit Court of

) Cook County.

Plaintiff-Appellee, ) 

)

v. ) 

)

ENTERASYS NETWORKS, INC. formerly known )

as Cabletron Systems, Inc., a Delaware )

Corporation, ) Honorable

) Sheldon Gardner,

Defendant-Appellant. ) Judge Presiding.

PRESIDING JUSTICE QUINN delivered the opinion of the court:

Defendant, Enterasys Networks, Inc. (Enterasys), formerly known as Cabletron Systems, Inc. (Cabletron), a Delaware corporation, appeals from circuit court orders granting summary judgment and a petition for entry of a damage award in favor of plaintiff, Fleet Business Credit, LLC (Fleet), a Delaware limited liability company. On appeal, Enterasys asserts that section 4.4(b) of a "Referral and Remarketing Agreement" (Remarketing Agreement) that was executed by the parties on March 31, 2000 (as amended on March 2, 2001), is an unenforceable penalty clause and not a recourse provision, as found by the court.  For the following reasons, we affirm.

BACKGROUND

Enterasys manufactures and distributes telecommunications and networking equipment.  Fleet provides business-related financing to customers of manufacturers like Enterasys.  Enterasys sought to stimulate the sales of its products by making retail financing programs available to its customers.  Consequently, on March 31, 2000, Enterasys and Fleet entered into the Remarketing Agreement, whereby Fleet agreed to purchase products from Enterasys which then would be leased simultaneously to Enterasys' customers. The Remarketing Agreement sets forth the terms and obligations applicable to all Fleet financing of Enterasys' manufactured or distributed products and requires that Enterasys and Fleet enter into a "Transaction Supplement" each time that Fleet provides financing to a particular Enterasys customer.  Under the provisions established by the Remarketing Agreement, the Transaction Supplement, among other things, would identify the customer and products subject to the financing, specify the discount rate applicable to the financing and set forth any recourse provisions, warranties and covenants related to the particular financing.

While negotiating and entering into the Remarketing Agreement, Fleet and Enterasys anticipated that Fleet-financed products might be returned on occasion.  Because of Enterasys' quality sales staff, distribution network and product knowledge necessary to remarket any returned equipment to new customers, Fleet insisted on Enterasys' commitment to provide remarketing services.  As a result, the Remarketing Agreement included provisions relating to Enterasys' obligations to remarket returned products.  Enterasys agreed to: (1) perform "Off-Lease" duties, including taking possession of the Off-Lease products, refurbishing such products and undertaking, on a best efforts basis, to re-lease, rent, lease or sell the products without discriminating against such products in favor of any products owned, managed or remarketed by Enterasys; (2) provide monthly remarketing reports; (3) inform Fleet of prospective lessees, users or purchasers and provide proposed documentation and credit information for Fleet's written approval; (4) deliver promptly to Fleet all documents related to the remarketing of any product; and (5) remit immediately all proceeds of any remarketing, net of sales, use, property, excise, ad valorem or similar taxes to Fleet.

The Remarketing Agreement also addressed concerns raised by Enterasys' plans, announced contemporaneously to the negotiation of the Remarketing Agreement, to change its corporate structure.  According to a February 2000 Enterasys press release, Enterasys, which then conducted business as Cabletron, stated that it planned to form four operating affiliate companies, namely, Riverstone Networks, Inc. (Riverstone), Enterasys Networks, Inc. (Enterasys-sub), Aprisma Management Technologies, Inc. (Aprisma), and Global Network Technology Services (Global Network), and had begun a reorganization process under which it planned to sell parts of its business.  The press release noted that "the eventual goal is to have four separate, publicly traded companies."

Mark Sullivan, the Fleet vice-president who negotiated the Remarketing Agreement with Enterasys, testified by deposition that he expressed concern to Enterasys representatives regarding the proposed reorganization of Enterasys' corporate structure, stating, "[I] [d]on't know what you guys are going to do here as far as how these companies are going to look, but we're credit-approving a consolidated entity, and our agreement is going to make sure that when you do whatever you do, we're going to have the same credit support that we're approving now."

Joseph Cardona, the Fleet credit officer who reviewed the Enterasys transaction, also noted his concern about the potential effect of the corporate changes contemplated by Enterasys.  By deposition, Cardona testified regarding Enterasys' obligation to make Fleet financially whole to the extent of the percentage of agreed-upon recourse.  Cardona stated:

"[Fleet's] concern here was that -- and it's outlined in one of [Enterasys'] approvals -- was that an entity other than [Enterasys], as it existed at the time, would be in a better position to remarket the equipment as well.  For example, Enterasys was in a better position because *** that was the equipment they were manufacturing, remarketing, selling to their customers.  ***  So in the event that Enterasys would change its standing and not be Cabletron or be a separate entity, we want to make sure that we had the best party to support the [Remarketing Agreement]."

As a result of Fleet's concerns, the Remarketing Agreement provided that Enterasys would not: (1) cease to support products comparable to the equipment that was the subject of financing contracts between Fleet and Enterasys' customers; (2) sell, transfer or convey a substantial part of its assets; or (3) effect or be party to any merger or consolidation.  Further, section 4.3(d) of the Remarketing Agreement states: 

"In the event that [Enterasys] creates subsidiaries and either continues to own their stock or allows such subsidiaries to issue their shares to other investors and no longer be subsidiaries, [Enterasys] covenants that each subsidiary shall execute in favor of [Fleet] a guaranty or an assumption of [Enterasys'] obligations under this Agreement and each Transaction Summary, satisfactory in form and content to [Fleet]."

Significantly, in reliance upon Enterasys' remarketing commitments and other representations, and their importance to Fleet's participation in the Enterasys financing program, Fleet also obtained Enterasys' agreement to purchase all "Retail Contracts" entered into by Fleet with Enterasys' customers if Enterasys breached its representations, warranties or covenants.  Section 4.4(b) of the Remarketing Agreement, entitled, "Covenant Breach," provides:

"If [Enterasys] is in breach of any representation, warranty or covenant in this Agreement (other than representation, warranty or covenant contained in Section 4.2 or in 4.3(d)) or in any Transaction Supplement, and such breach is not cured within thirty days after [Fleet's] notification of such breach, or if [Enterasys] is in breach of any covenant set forth in Section 4.3(d) of this Agreement, [Enterasys] will immediately upon demand by [Fleet] purchase all Retail Contracts entered into by [Fleet] pursuant to this Agreement for their aggregate Unpaid Balances."

Section 1.5 of the Remarketing Agreement states that "'Retail Contracts' shall mean any and all writings evidencing or reflecting: (a) [Fleet's] financing of the retail sale of Products by [Enterasys] to Customers, including leases with nominal purchase options, or (b) [Fleet's] leasing of Products to Customers."  The Remarketing Agreement defines an unpaid balance with respect to a Retail Contract as:

"(i) all past due rental payments and other amounts, including late charges, owing on the Retail Contract, plus interest on same from the date the payment was due until it is paid, calculated at the Discount Rate applicable to such Retail Contract, (ii) the present value of the remaining scheduled payments on such Retail Contract, calculated by using the Discount Rate applicable to such Retail Contract, (iii) the present value of the Assumed Residual Value, if any, for the Product subject to such Retail Contract, calculated by using the Discount Rate applicable to such Retail Contract, less any amounts received by [Fleet] as rent after the initial term of such Retail Contract, plus (iv) interest accrued on the Assumed Residual Value, if any, relating to the Product subject to such Retail Contract from and after the time of the expiration of the initial term of such Retail Contract at a rate equal to the Discount Rate, plus (v) any reasonable out-of-pocket expenses, including without limitation legal fees, incurred by [Fleet] in connection with its financing of the Product subject to the Retail Contract or incurred by [Fleet] or paid to Aida in connection with the recovery, storage, testing, maintenance, cleaning, reconditioning, refurbishment or other remarketing and disposition services for such product." 

Therefore, under the express language of the Remarketing Agreement, if Enterasys did not provide the remarketing services contracted for, or violated the protections crafted in response to Enterasys' announced corporate reorganization plans, Enterasys, upon demand by Fleet, was required to purchase from Fleet the remaining balances from the financing contracts that Fleet had executed with Enterasys' customers.  

Beginning in March 2000 and continuing through September 2000, pursuant to the terms of the Remarketing Agreement, Fleet entered into four separate lease contracts with Enterasys' customer, Vitts Networks, Inc. (Vitts), in which Fleet financed approximately $13,900,000 worth of products (Vitts Retail Contracts).  The equipment leased by Vitts consisted primarily of materials manufactured by Enterasys, although it also included various parts that Enterasys had obtained from companies known as Net-to-Net and Walker & Associates.  In addition to its entry into the Vitts Retail Contracts, Fleet simultaneously executed four related Transaction Supplements with Enterasys.  Under the financing structure set forth in the Vitts Retail Contracts and the related Transaction Supplements and, as contemplated in the Remarketing Agreement, Fleet purchased from Enterasys the equipment as delineated in the Transaction Supplements and then leased it to Vitts.

Fleet recognized that the market for used Enterasys equipment was weak, that Enterasys' older systems necessitated heavy discounting for new Enterasys equipment and that Enterasys was desperate for market share.  As articulated in the risk analysis form Fleet completed contemporaneously to the execution of the Remarketing Agreement, Fleet negotiated for and received what it alleges are two primary forms of credit protection from Enterasys as part of the Vitts financing, namely: (1) a 75% recourse payment from Enterasys upon a Vitts payment default; and (2) Enterasys' remarketing of any equipment returned by Vitts.  Sullivan testified that the combination of the 75% recourse payment and Enterasys' remarketing gave Fleet 100% credit protection, stating:

"[G]enerally the way we viewed it was that we thought with the proper remarketing, there was plenty of value in the equipment should Vitts blow up quickly. [W]e understand there was less collateral value out at the later part of the transaction.  Our big concern was the first year of the transaction.  If Vitts is not able to raise that capital and Vitts goes away, we had *** the 75 percent recourse from [Enterasys], and we thought we were well covered with our 25 percent residual position *** with proper remarketing in proper channels." 

According to Sullivan, Fleet believed that, through the Remarketing Agreement, Enterasys' reselling of any Vitts-returned equipment through Enterasys' existing distribution channels for the leased equipment, which consisted of switches and modems, gave Fleet's collateral the value necessary to provide the 25% credit protection essential to Fleet's risk analysis.

Prior to executing the Remarketing Agreement, the record shows, Enterasys also was aware of the essential role its remarketing would play in protecting Fleet from a loss in the event of a Vitts default.  Sullivan testified that he had conversations with Enterasys representatives to assure him that Enterasys understood the importance of the remarketing responsibilities Enterasys was committing to perform under the Remarketing Agreement.  When Sullivan expressed concern to Enterasys' representatives regarding whether they were capable of remarketing the equipment to be leased to Vitts, according to Sullivan, the representatives responded, "[s]ure, we do it all the time."  The Remarketing Agreement, however, provided that Enterasys made no warranties or representations as to the results of its remarketing efforts.

On February 7, 2001, Vitts declared bankruptcy and defaulted under the Vitts Retail Contracts.  Vitts' default triggered Enterasys' recourse obligations under the recourse provision set forth in the Transaction Supplements.  On March 13, 2001, Enterasys fully satisfied its recourse obligation under the Transaction Supplements by wire transferring 75% of the unpaid purchase price, totaling $10,440,000, to Fleet.  

Vitts' bankruptcy also triggered Enterasys' remarketing obligations under the Remarketing Agreement with Fleet.  According to Enterasys' representatives, on or about April 16, 2001, Enterasys began to take possession of products Fleet had leased to Vitts, making subsequent retrievals of products from Vitts in May, June, August and September 2001.  As a result of these retrievals, Vitts claims to have returned to Enterasys, and Enterasys acknowledged receipt of, products with an initial purchase price of approximately $11 million.  

Stuart Schwartz, Fleet First vice-president, stated by affidavit that, in June 2001, Robert Barber, Enterasys senior vice- president of business development, informed Fleet that Enterasys could dispose of the retrieved equipment for approximately $9 million.  Schwartz testified by deposition that the $9 million estimate was revised in August 2001 to $4,500,000 by Barber and Enterasys' general counsel, Gerald Haines, after Enterasys had received and inspected five shipments of equipment from Vitts.  Haines stated by affidavit that, "[a]s the equipment was returned and inspected by [Enterasys], it became apparent that virtually none of this equipment was in its original packaging and virtually all of the equipment had been used, handled and stored poorly, and thus could not be remarketed for any substantial value without extensive refurbishing by Enterasys at Fleet's expense."  According to Barber's affidavit, in June, July and August 2001, the resale value of the entire amount of equipment actually returned by Vitts totaled no more than $500,000.  Barber also stated that he never told Schwartz that the returned equipment had an estimated value of $9 million. 

Haines' affidavit further stated that on July 23, 2001, he received a letter from Schwartz questioning whether Enterasys-sub had been "spun-off" from Enterasys and became a separate company.  Haines responded to Schwartz that Enterasys-sub had not been spun-off, but instead merged into Enterasys and assumed all of Enterasys' obligations under the Remarketing Agreement and that, therefore, "Fleet and [Enterasys] were better off through this merger."   

Pertinent to the instant case, Fleet claims that Enterasys breached its obligations under the Remarketing Agreement, thereby triggering the covenant breach provisions in section 4.4(b).

First, Fleet alleges that Enterasys breached the Remarketing Agreement with respect to its covenant not to sell, transfer or convey substantial amounts of its assets, nor effect or be a party to a merger or consolidation.  Schwartz stated in his affidavit that, on February 16, 2001, Riverstone undertook an initial public offering of its equity securities, which reduced Enterasys' ownership of Riverstone's common equity from 100% to 87%.  On July 16, 2001, Enterasys disposed of Global Network in a sale to a private buyout firm associated with a group of Global Network managers.  According to subsequent Enterasys public disclosures, on August 6, 2001, Enterasys distributed its Riverstone stock to Enterasys shareholders.  On that same date, Enterasys announced that it had merged with Enterasys-sub.  The announcement also disclosed that Enterasys had become the surviving corporation and changed its name from "Cabletron Systems, Inc.," to "Enterasys Networks, Inc."  Aprisma remained a wholly owned subsidiary of this merged entity.

Second, Fleet claims that Enterasys failed to obtain Fleet's approval prior to reselling certain products to Riverstone and to remit immediately the proceeds of that sale.  According to the Remarketing Agreement, prior to any proposed remarketing, Enterasys was required to provide Fleet with the name of the prospective purchaser, a copy of the proposed lease, renewal, extension or contract for the sale and sufficient credit information with respect to each proposed purchaser for Fleet "to make an informed judgment" as to the purchaser's creditworthiness.  After the sale is completed, the Remarketing Agreement obligates Enterasys promptly to provide to Fleet "the executed contract for the sale of the Product and all other documents effecting or evidencing such sale."   According to Fleet, Enterasys breached the Remarketing Agreement by entering into a secretive, heavily discounted and unapproved sale with Riverstone for approximately $248,594.  Fleet notes it is unclear whether the sale to Riverstone was a sale for the purpose of remarketing or whether Riverstone sold the parts formerly leased to Vitts for an amount greater than what was paid to Enterasys, and that the proceeds received by Riverstone are what should have been paid to Fleet.  Fleet also claims that Enterasys never provided Fleet with a purchase order for the Riverstone sale or sought prior written approval of this transaction.  No documentation evidencing the sale or demonstrating Riverstone's creditworthiness was presented to Fleet.  Finally, Fleet claims that Enterasys failed to report the proceeds of the sale to Fleet until October 5, 2001, which was two weeks after the expiration of the 30-day cure period as provided in the Remarketing Agreement. 

Third, Fleet maintains that Enterasys failed to provide monthly remarketing reports detailing the products retrieved from Vitts and the remarketing-related information Enterasys contracted to provide.  On May 21, 2001, Schwartz addressed a letter to Barber requesting that Enterasys provide a report on the status of the recovery and sale of the equipment leased to Vitts, including Enterasys' marketing plans to dispose of the Equipment and an assessment as to the amount of proceeds likely to be received.  Enterasys failed to respond to Schwartz's request, whereafter Schwartz sent Haines a July 26, 2001, letter stating, "[t]he [remarketing] report is due monthly and long overdue.  [Fleet] has approximately $3,500,000 at stake.  Given the lack of any remarketing proceeds to date I must demand that the report for June, 2001 be furnished immediately and that future reports be delivered when due."  An August 7, 2001, electronic mail from Schwartz to Barber noted Fleet's request "to get the reports required by the [Remarketing Agreement] ASAP," including inventories, receipts, purchase orders, shipping documents, remarketing plans, sales and refurbishment documents and an accounting for all proceeds.  

Fleet claims that Enterasys failed to submit the necessary information as required and, instead, provided information in a fragmentary and conflicting manner that only raised additional concerns regarding Enterasys' stewardship of the Fleet-owned equipment retrieved from Vitts.  Enterasys sent Fleet a listing of returned equipment that conflicted with both the amounts Vitts claimed to have returned to Enterasys and an inventory Fleet had conducted of the retrieved products stored at Enterasys' facilities.  Fleet asserts that Enterasys could not account for $3,500,000 of products it had retrieved from Vitts, contrary to Enterasys' own records.  According to Fleet, Enterasys refused to reconcile the $3,500,000 difference between the value of products that Vitts claims to have returned to Enterasys and the value of products counted in the August 2001 physical inspection by Fleet's representative.

Finally, pursuant to the March 2, 2001, amendment to the Remarketing Agreement, the parties agreed:

"Without nullifying any of the foregoing, [Enterasys] agrees to deliver to [Fleet] by June 30, 2001 guaranties, in form and substance satisfactory to [Fleet] under the [Remarketing] Agreement and each of the Vitts Transaction Supplements executed by [Riverstone, Enterasys-sub, Global Network and Aprisma]."

Fleet claims that Enterasys failed to provide Fleet with written guaranties by June 30, 2001, or any time thereafter.

On August 20, 2001, Fleet provided notice of certain Enterasys defaults under the Remarketing Agreement.  As previously noted, section 4.4(b) of the Remarketing Agreement allowed Enterasys to cure a covenant breach within 30 days after Fleet's notification of such breach.  Fleet claims that Enterasys never cured any of the defaults set forth in the August 20 notice.

On September 26, 2001, pursuant to section 4.4(b) of the Remarketing Agreement, Fleet demanded that Enterasys purchase the Vitts Retail Contracts for an amount totaling $3,754,513.18, plus a 
per
 
diem
 interest payment of $972 from October 1, 2001, until payment, which was the amount equal to Fleet's aggregate "Unpaid Balances" on such contracts, less a credit for the recourse payment made by Enterasys in March 2001.  Enterasys refused the demand on October 1, 2001, but remitted to Fleet $247,847.50, which purportedly represented the remarketing proceeds of its sale of products to Riverstone as previously noted.

On October 10, 2001, Fleet filed a breach of contract action against Enterasys in the circuit court, alleging that Enterasys violated the Remarketing Agreement because it failed to: (1) provide monthly remarketing reports; (2) obtain Fleet's approval of the sale of equipment to Riverstone; and (3) submit written guaranties.  In addition, Fleet alleged that Enterasys breached the Remarketing Agreement based on Enterasys' merger with Enterasys-sub.  Due to the above breaches, Fleet alleged that Enterasys triggered the purchase obligation under section 4.4(b) of the Remarketing Agreement and sought damages in the amount of $3,506,665.68, the amount equal to the unpaid balances on the Vitts Retail Contracts, plus interest and Fleet's out-of-pocket expenses related to its efforts to enforce its rights under the Remarketing Agreement.

Fleet moved for summary judgment on December 3, 2001.  In response, Enterasys denied that it had breached the Remarketing Agreement and further argued that, even if it had breached the Remarketing Agreement in the manner Fleet alleged, section 4.4(b) was an unenforceable penalty provision under Illinois law.  Enterasys characterized the amount of damages sought by Fleet as liquidated damages.

On June 20, 2002, the circuit court granted summary judgment in favor of Fleet on the issue of liability, reserving for a future determination the question of Fleet's damages under the Remarketing Agreement.  The court ordered the parties to submit further briefing on the issue of whether section 4.4(b) of the Remarketing Agreement was an unenforceable liquidated damages clause.

On October 9, 2002, the circuit court heard argument on Fleet's petition for entry of a damage award.  Enterasys argued that section 4.4(b) of the Remarketing Agreement was an unenforceable penalty provision because: (1) the parties did not agree in advance that section 4.4(b) was the appropriate measure of damages for any breach of the Remarketing Agreement; (2) section 4.4(b) was not a reasonable forecast of actual damages resulting from a breach of the Remarketing Agreement; and (3) the actual damages, if any, sustained by Fleet as a result of the alleged breaches are capable of estimation.  The court characterized the Remarketing Agreement as follows:

"As I see it, Enterasys basically says, 'Look, we got the deal.  We've got the product.  We need somebody for finances because we don't have the capital.'  That's basically what the transaction is about.

The money people, which is Fleet, says, 'Look, we'll finance you, but we have to be protected.'  So what they're looking for in the underlying deal is for you to take back anything that goes bad." 

The circuit court granted Fleet's petition for entry of a damage award, finding, "I don't think [section 4.4(b) is] punitive because the nature of the obligation is more in recourse and making whole, which [by] definition can't be punitive."  In a December 2, 2002, final judgment order, the court awarded Fleet $3,506,665.68, which represented the unpaid balances under the Vitts Retail Contracts, plus prejudgment interest from October 1, 2001, totaling $265,421.94, attorney fees in the amount of $84,214.42 and $9,014.08 in out-of-pocket costs.  The court also granted in part and denied in part Enterasys' motion for reconsideration, modifying its October 9, 2002, order to provide a reduction of the judgment amount in the event Fleet obtained any additional payments related to the Vitts Retail Contracts.  Enterasys appeals the court's June 20, 2002, October 9, 2002, and December 2, 2002, orders.  

ANALYSIS

To determine Enterasys' appeal, we must review whether section 4.4(b) of the Remarketing Agreement is: (1) ambiguous; (2) a liquidated damages provision; and (3) an unenforceable penalty provision.
(footnote: -6)  

Summary judgment properly is granted where the pleadings, depositions, admissions on file and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  735 ILCS 5/2-1005 (West 2002); 
Anderson v. Alberto-Culver USA, Inc.
, 317 Ill. App. 3d 1104, 1110, 740 N.E.2d 819 (2000)
.  The movant's right to judgment must be clear and free from doubt; any evidence supporting the motion must be strictly construed against the movant and liberally construed favoring the respondent.  
Curtis v. Jaskey
, 326 Ill. App. 3d 90, 92-93, 759 N.E.2d 962 (2001); 
Kleinwort Benson North America, Inc. v. Quantum Financial Services, Inc.
, 285 Ill. App. 3d 201, 208-09, 673 N.E.2d 369 (1996).  An appeal from summary judgment is reviewed 
de
 
novo
.  
Anderson
, 317 Ill. App. 3d at 1110; 
Zoeller v. Augustine
, 271 Ill. App. 3d 370, 374, 648 N.E.2d 939 (1995).

I

Enterasys initially asserts that the circuit court's construction of section 4.4(b) is inconsistent with the plain language of the Remarketing Agreement.  According to Enterasys, the court ignored or misread provisions in the Remarketing Agreement which unambiguously stated that recourse terms, if any, would be at the discretion of Enterasys and would be contained in the separate Transaction Supplements executed in conjunction with the grant of retail financing to a particular customer such as Vitts.  Enterasys points to section 1.7 of the Remarketing Agreement, which provides:

"'Transaction Supplement' shall mean a supplement to this Agreement prepared in connection with each extension of Retail Financing by [Fleet] which identifies the Customer and Product(s) subject to the Retail Financing, the Discount Rate applicable to such Retail Financing, any applicable recourse provisions with respect to such Retail Financing, and any additional warranties or covenants applicable to such Retail Financing."

Enterasys also notes that the provisions from section 3.3 of the Remarketing Agreement support its argument that the contracting parties agreed the full extent of Enterasys' recourse obligations would be contained in the Transaction Supplements.  Section 3.3 of the Remarketing Agreement states:

"From time to time [Enterasys] may, but shall not be obligated to, agree to provide credit support to [Fleet] with respect to a particular Retail Financing transaction.  The extent and manner of recourse shall be set forth in the Transaction Supplement applicable to each Retail Financing."

Enterasys argues that interpreting section 4.4(b) as providing for recourse renders meaningless the language of sections 1.7 and 3.3, which limit recourse obligations to the Transaction Supplements.  Enterasys maintains that it fully complied with its recourse obligations under the Transaction Supplements by paying Fleet 75% of the purchase price on the Vitts Retail Contracts.

Fleet responds that Enterasys, at no point in its argument, asserts an ambiguity that would have entitled the circuit court to look beyond the plain language of the Remarketing Agreement to determine the parties' intent when including section 4.4(b).  Fleet argues that the explicit terms of section 4.4(b) demonstrate the parties' clear intent to agree from the outset on Enterasys' exact obligations in the event of its breach of the Remarketing Agreement.  According to Fleet, given the normal and logical meaning of the language expressed in section 4.4(b), the court correctly found that the face of the contract set forth the parties' intent to create a remedy for Enterasys' breach. 

A contract does not exist in a vacuum; its terms must be understood in light of the commercial context within which it was drawn.  
Archer-Daniels-Midland Co. v. Illinois Commerce Comm'n
, 184 Ill. 2d 391, 400, 704 N.E.2d 387 (1998); 
Kellner v. Bartman
, 250 Ill. App. 3d 1030, 1036, 620 N.E.2d 607 (1993).  A contract construed as a matter of law by the circuit court may be construed independently by a reviewing court, unrestrained by the circuit court's judgment.  
Lewis X. Cohen Insurance Trust v. Stern
, 297 Ill. App. 3d 220, 232, 696 N.E.2d 743 (1998); 
Zale Construction Co. v. Hoffman
, 145 Ill. App. 3d 235, 240, 494 N.E.2d 830 (1986).
  
The principal objective in construing a contract is to determine and give effect to the intention of the parties at the time they entered into the contract.  
Schweihs v. Davis, Friedman, Zavett, Kane & MacRae
, 344 Ill. App. 3d 493, 500, 800 N.E.2d 448 (2003); 
Zale
, 145 Ill. App. 3d at 241; 
Ancraft Products Co. v. Universal Oil Products Co.
, 100 Ill. App. 3d 694, 697, 427 N.E.2d 585 (1981).
  To determine the intent of the parties, the court must look to the instrument itself, its purposes and the surrounding circumstances of its execution and performance.  

When a dispute exists between the parties as to the meaning of a contract provision, the threshold issue is whether the contract is ambiguous.  
Installco, Inc. v. Whiting Corp.
, 336 Ill. App. 3d 776, 783, 784 N.E.2d 312 (2002)
.  Contractual language is ambiguous when it is "'susceptible to more than one meaning [citation] or is obscure in meaning through indefiniteness of expression.'"  
Shields Pork Plus, Inc. v. Swiss Valley Ag. Service
, 329 Ill. App. 3d 305, 310, 767 N.E.2d 945 (2002), quoting 
Wald v. Chicago Shippers Ass'n.
, 175 Ill. App. 3d 607, 617, 529 N.E.2d 1138 (1988).  An ambiguity is not created by the mere fact that, as here, the parties do not agree upon an interpretation.  
Groshek v. Frainey
, 274 Ill. App. 3d 566, 569, 654 N.E.2d 467 (1995);  
Zale
, 145 Ill. App. 3d at 241; 
Harlem-Irving Realty, Inc. v. Alesi
, 99 Ill. App. 3d 932, 936, 425 N.E.2d 1354 (1981).  Illinois courts follow the "four corners" rule when interpreting contracts, which requires:

"'An agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it.  It speaks for itself, and the intention with which it was executed must be determined from the language used.  It is not to be changed by extrinsic evidence.'"  
Air Safety, Inc. v. Teachers Realty Corp
., 185 Ill. 2d 457, 462, 706 N.E.2d 882 (1999),
 quoting 
Western Illinois Oil Co. v. Thompson
, 26 Ill. 2d 287, 291, 186 N.E.2d 285 (1962).

A court may consider extrinsic evidence provisionally, however, for the limited purpose of determining whether an ambiguity exists.  
Air Safety
, 185 Ill. 2d at 463; 
Economy Preferred Insurance Co. v. Jersey County Construction, Inc.
, 246 Ill. App. 3d 387, 390, 615 N.E.2d 1290 (1993).  Whether the contract is ambiguous is an issue of law.  
Installco
, 336 Ill. App. 3d at 783; 
Ancraft
, 100 Ill. App. 3d at 697.  

Considering Enterasys' assertion that the application of section 4.4(b) in this case would render meaningless sections 1.7 and 3.3 of the Remarketing Agreement, section 264 of 
Contracts
, American Jurisprudence Second, provides:

"Construing contemporaneous instruments together means simply that if there are any provisions in one instrument limiting, explaining, or otherwise affecting the provisions of another, they will be given effect ***.  This does not mean that the provisions of one instrument are imported bodily into another; *** they may be intended to be separate instruments and to provide for entirely different things."  17A Am. Jur. 2d  
Contracts
 §264, at 670 (1964). (See also 
USX Corp. v. Prime Leasing, Inc.
, 988 F.2d 433 (3d Cir. 1993) (finding that nonrecourse provisions in a note and security agreement pertained only to certain breaches of the terms of documents in which they appeared and did not preclude the lender from recovering damages against the borrower for any of the borrower's alleged breaches of notice requirements of collateral assignments, which were part of the same financing arrangement as the note and security agreement).

Here, contrary to Enterasys' argument, the circuit court did not confuse what would make Fleet "whole" for Vitts' default of the Vitts Retail Contracts with what would make Fleet "whole" for Enterasys' breach of the Remarketing Agreement.  Section 4.4(b) provides Fleet with repayment of its financing of the Vitts Retail Contract separate from the Transaction Supplements' recourse provisions in that it requires Enterasys to "purchase all Retail Contracts entered into by [Fleet] pursuant to [the Remarketing Agreement] for their aggregate unpaid balances" if Enterasys "
is in breach of any representation, warranty or covenant in [the Remarketing Agreement]
."  (Emphasis added.)  This unambiguous contractual language provides that Fleet ensured 100% recovery of its financing on the Vitts Retail Contracts in the event Vitts defaulted and Enterasys breached certain covenants as delineated in the Remarketing Agreement.  

Although not discussed by the parties on appeal, section 
3.2(g) of the Remarketing Agreement, entitled, "Remarketing Proceeds," also contemplated that Fleet was entitled to 100% recovery of its financing on the Vitts Retail Contracts, even if Enterasys had not breached any covenants under section 4.4(b), stating that all proceeds of any remarketing shall be Fleet's property and that, after Enterasys' out-of-pocket costs are reimbursed, Enterasys is obliged to pay Fleet "the Unpaid Balance for the Product *** 
until such Unpaid Balance is reduced to zero
." 
 (Emphasis added.)  

Enterasys does not challenge the fact that it breached certain covenants under the Remarketing Agreement, thereby triggering the provisions of section 4.4(b).  Further, Enterasys 
has neither  advocated an opposing reasonable interpretation
 of section 4.4(b), nor provided any record evidence demonstrating why the language of section 4.4(b) may be construed as ambiguous.  

A contractual recourse provision provides "[t]he right to repayment of a loan from the borrower's personal assets, not just from the collateral that secured the loan."  Black's Law Dictionary 1280 (7th ed. 1999).  Although Enterasys correctly notes that the Transaction Supplements provide certain recourse provisions in the event of a Vitts default, section 4.4(b) of the Remarketing Agreement clearly requires Enterasys to pay Fleet the remaining unpaid balances on the Vitts Retail Contracts if Enterasys breached any covenant as provided in the Remarketing Agreement, which occurred here.  No ambiguity exists in section 4.4(b) of the Remarketing Agreement as a matter of law.  Accordingly, summary judgment in favor of Fleet was proper.

II

Nevertheless, Enterasys maintains that section 4.4(b) of the Remarketing Agreement is an unenforceable liquidated damages provision because it represents the agreement of the parties as to the amount of damages which must be paid in the event of a default, citing 
Northern Illinois Gas Co. v. Energy Cooperative, Inc.
, 122 Ill. App. 3d 940, 947, 461 N.E.2d 1049 (1984).  Enterasys notes that Fleet concedes section 4.4(b) is a "remedy" provision, which differs from recourse.  According to Enterasys, section 4.4(b) is a liquidated damages provision although the "damages" are styled as a "purchase obligation" requiring Enterasys to buy all the Vitts Retail Contracts for their outstanding balance.  Enterasys relies upon a Missouri Court of Appeals case, 
AAA Uniform & Linen Supply, Inc. v. Barefoot, Inc
., 81 S.W.3d 133 (Mo. App. 2002), in support of its argument that section 4.4(b) was "intended to be an incentive - a penalty," to keep Enterasys from violating any of the myriad of covenants and warranties contained in the Remarketing Agreement.

Fleet responds that section 4.4(b) of the Remarketing Agreement creates a purchase obligation, not a liquidated damages provision.  According to Fleet, because Enterasys decided to abandon its remarketing reporting obligations, dispose of returned equipment without obtaining Fleet's approval, merge with an affiliate and change its corporate structure without obtaining the guaranties necessary to preserve Fleet's remarketing and recourse rights, Enterasys should bear the consequences by purchasing the lease contracts previously financed by Fleet.  Enterasys' failure to file the required reports makes it impossible to determine, what if anything, Enterasys did to attempt to sell the equipment recovered from Vitts.  Consequently, Fleet argues that their damages are for the full amount of the unpaid balances and, therefore, the circuit court properly awarded Fleet $3,506,665.68 in damages.

In 
Northern Illinois Gas
, in addition to providing the definition of a liquidated damages clause, the appellate court held that the circuit court erred by finding that a liquidated damages clause is not a limitation on a remedy to seek an alternate measure of damages. 
Northern Illinois Gas
, 122 Ill. App. 3d at 949. 
Northern Illinois Gas
 court found that "[t]he parties agreed to a liquidated sum as their damages in the event of default."  
Northern Illinois Gas
 is inapplicable to the present case because, here, the parties did not agree to a liquidated sum in the event of default; rather, Enterasys agreed to purchase from Fleet the remaining unpaid balances on the Vitts Retail Contracts.

Similarly, 
AAA Uniform
 is inapplicable to the instant case because, there, the court refused to apply a liquidated damages clause since it would have placed the nonbreaching party in a better position, rather than the same position, had the breach never occurred.  
AAA Uniform
, 81 S.W.3d at 138.  Here, Enterasys' breach of the covenants as provided in the Remarketing Agreement required that Fleet recover only an amount that would put it in the same position it was in prior to agreeing to finance the Vitts Retail Contracts. 

To illustrate further that section 4.4(b) does not constitute a liquidated damages clause, the record demonstrates that the Remarketing Agreement involved risk allocation with respect to Enterasys' remarketing abilities, specifically, Enterasys' promise to remarket products that Fleet leased to Vitts if Vitts defaulted.  Section 4.4(b) of the Remarketing Agreement allocated for Fleet's risk by requiring Enterasys to purchase the remaining Vitts Retail Contracts if Enterasys breached certain covenants that were agreed upon in the Remarketing Agreement.  Similarly, although not a financing agreement as in the present case, a "take-or-pay" contract, which is common in the natural gas industry, is viewed as a risk-allocation contract:

"The purpose of the take-or-pay clause is to apportion the risks of natural gas production and sales between the buyer and seller.  The seller bears the risk of production.  To compensate seller for that risk, buyer agrees to take, or pay for if not taken, a minimum quantity of gas.  The buyer bears the risk of market demand.  The take-or-pay clause insures that if the demand for gas goes down, seller will still receive the price for the Contract Quantity delivered each year."  
Universal Resources Corp. v. Panhandle Eastern Pipe Line Co.
, 813 F.2d 77, 80 (5th Cir. 1987).

Here, like the seller in take-or-pay clauses, Fleet ensured it would receive the full amount for its allocated risk, namely, a 100% return in its agreement with Enterasys to buy and lease Enterasys' manufactured equipment to Vitts, by Enterasys' promise to remarket the equipment upon a Vitts default or pay the remaining unpaid balances on the Vitts Retail Contracts if Enterasys breached certain covenants as provided in the Remarketing Agreement.  Enterasys characterizes the various breaches as "relatively minor."  We disagree.  The record shows that Enterasys merged with its affiliate, Enterasys-sub, sold Fleet's equipment to an affiliate at a deeply discounted price without Fleet's approval and failed to provide the required reports of their remarketing efforts and obtain necessary guaranties from its subsidiaries by June 1, 2001.  Therefore, by breaching these covenants, Enterasys was obligated to pay Fleet the unpaid balances from the Vitts Retail Contracts.  Enterasys breached its section 4.4(b) purchase obligation when it failed to pay Fleet $3,500,000, the amount equal to the unpaid balances under the Vitts Retail Contracts.

The foregoing supports our conclusion that Enterasys has failed to provide this court with either appropriate legal authority or record evidence to establish that section 4.4(b) of the Remarketing Agreement is anything other than a purchase obligation that arose upon Enterasys' breach of certain covenants.

III 

Even if this court were to find that section 4.4(b) of the Remarketing Agreement is a liquidated damages clause, section 4.4(b) is not an unenforceable penalty provision.

"The determination of whether a contractual provision for damages is a valid liquidated damages provision or a penalty clause is a question of law."  
Grossinger Motorcorp, Inc. v. American National Bank & Trust Co.
, 240 Ill. App. 3d 737, 749, 607 N.E.2d 1337 (1992)
.  In Illinois, liquidated damages provisions will be found valid and enforceable when: "(1) the parties intended to agree in advance to the settlement of damages that might arise from the breach; (2) the amount of liquidated damages was reasonable at the time of contracting, bearing some relation to the damages which might be sustained; and (3) actual damages would be uncertain in amount and difficult to prove."  
Grossinger
, 240 Ill. App. 3d at 749; see also Restatement (Second) of Contracts §356(1) (1981).  "The damages must be a specified amount for a specific breach, not a penalty to punish for nonperformance or as a means to secure performance."  
Grossinger
, 240 Ill. App. 3d at 750.

Significantly, Enterasys asserts that this court should construe section 4.4(b) as an unenforceable liquidated damages clause, but then argues there is no evidence that Fleet and Enterasys ever agreed in advance that section 4.4(b) would serve as the proper measure or settlement of damages.  Enterasys cannot argue that section 4.4(b) is a liquidated damages clause and then contradictorily claim there is no evidence demonstrating that the parties intended to include a liquidated damages provision in the Remarketing Agreement.  Further, although Enterasys notes in its brief that the Remarketing Agreement states Enterasys "makes no representations or warranties," the context of that statement shows that it applies when Enterasys meets all of its obligations under the Remarketing Agreement, and does not apply when Enterasys breaches the covenants under the Remarketing Agreement.  Instead
, the record demonstrates that Fleet and Enterasys intended to agree in advance to the payment of damages that might arise from certain breaches of covenants in the form of a purchase obligation as provided in section 4.4(b).

Next, the remaining unpaid balances on the Vitts Retail Contracts represented a reasonable amount of damages at the time of contracting, in that they bore a clear relation to the damages which were likely to be and, in fact, were sustained by Fleet when Enterasys breached certain covenants as provided in the Remarketing Agreement.  Enterasys breached certain covenants prohibiting it from merging or conveying substantial amounts of its assets, which resulted in a loss of Fleet's ability to enforce the remarketing provisions of the Remarketing Agreement against the corporate entity it believed would provide such services and, consequently, its ability to sell the returned equipment through Enterasys' established sales network.  Further, Enterasys' failure to provide essential reports necessary for Fleet to oversee Enterasys' remarketing efforts also relates to the damages which might be sustained by Fleet, namely, the loss of its investment in the Vitts Retail Contracts.  Although we agree with Enterasys that the purpose of section 4.4(b) was to fix damages to secure Enterasys' performance, section 4.4(b) allowed Enterasys to cure the breach within 30 days and Enterasys does not contend that they cured any of the breaches.  Further, section 4.4(b) provided that Fleet could recover no more than it lost as a result of entering into the agreement to finance the Vitts Retail Contracts.  In conformance with this provision, the circuit court modified its October 9, 2002, order to provide a reduction of the judgment amount in the event Fleet obtained any additional payments related to the Vitts Retail Contracts, thereby ensuring that Fleet would not recover more funds than it had lost. 

Finally, although Enterasys claims that the parties at the time of contracting could have concluded that the damages resulting from Enterasys' breaches were capable of estimation, it cites no record evidence in support of this proposition.  Enterasys claims that Fleet's actual damages can be determined by reference to the secondary market for used networking equipment; however, Enterasys' assertion does not account for the valuation of damages from its various breaches of the Remarketing Agreement's covenants.  Enterasys failed to propose a formulation as to how to measure Fleet's damages from Enterasys' breach of their covenant: (1) not to sell, transfer or convey substantial amounts of its assets, nor effect or be a party to merger or consolidation; (2) to provide Fleet with information regarding a prospective purchaser and remit the proceeds immediately following the sale; (3) to submit monthly remarketing reports detailing the products retrieved from Vitts and remarketing-related information; and (4) to provide Fleet with written guaranties by June 30, 2001. The record evidence establishes that it was difficult to determine Fleet's losses with regard to remarketing at the time the Remarketing Agreement was executed because there was a wide discrepancy in the projected future values of the equipment.  See 
Penske Truck Leasing Co. v. Chemetco, Inc.
, 311 Ill. App. 3d 447, 455, 725 N.E.2d 13 (2000).

In light of the above, if we were to agree with Enterasys that section 4.4(b) of the Remarketing Agreement should be construed as a liquidated damages clause, it does not constitute an unenforceable penalty provision.  
    

Based upon the foregoing, the judgments of the circuit court of Cook County are affirmed.

Affirmed.

HARTMAN, J., concurs.

THEIS, J., dissents.

JUSTICE THEIS, dissenting:

Enterasys does not contest the trial court's finding that it breached the Remarketing Agreement, but argues only that section 4.4(b) of that agreement is an unenforceable penalty clause.  The majority apparently finds that the provision is a recourse provision requiring Fleet to be placed in the same position it was in prior to financing the Vitts Retail Contracts, and therefore, is enforceable.  In so holding, the majority, like the trial court, confuses two separate agreements and conflates two separate remedies for separate breaches.  Because I believe that section 4.4(b) of the Remarketing Agreement is not a recourse provision in the event of a Vitts default, I respectfully dissent.  

First, in this highly sophisticated transaction, the Remarketing Agreement never explicitly states that the purpose of the resale of the equipment was to provide Fleet with recourse upon default of the customer, or to provide Fleet with any credit support whatsoever.  Rather, two sections of the Remarketing Agreement refer to the Transaction Supplements for the sole applicable recourse provisions.  Section 1.7 explains that "any applicable recourse provisions with respect to such Retail Financing" would be contained in the Transaction Supplement and section 3.3 states that "[t]he extent of and manner of recourse shall be set forth in the Transaction Supplement."   These supplements contained a specific recourse provision in the event that Vitts defaulted on its retail contract whereby Enterasys would pay Fleet 75% of the purchase price of each supplement with a decreasing percentage scale depending on whether Vitts increased its capital by a certain amount.  In contrast, Enterasys agreed in the Remarketing Agreement to remarket the equipment upon either the expiration or termination of a lease agreement
 or 
in the event of a customer default, using its "best efforts," but with "no representations or warranties as to the results of such efforts."  I find that Enterasys made no guarantees that Fleet would be made whole. 

The majority cites parol evidence, including testimony by Fleet's representatives, that the combination of the 75% credit recourse plus the remarketing proceeds gave Fleet 100% credit protection.  The majority uses this testimony despite its finding that the Remarketing Agreement is not ambiguous.  If the agreement is unambiguous, this court cannot consider any extrinsic evidence beyond the four corners of the contract.  
Air Safety
, 185 Ill. 2d at 462-63.  Thus, while I disagree that any parol evidence is necessary in this case,  I must add additional evidence ignored by the majority.  In his deposition, Fleet's vice-president, Stuart Schwartz, testified that if Enterasys complied with all of the terms of the Remarketing Agreement, Fleet might not recover the remaining 25% from the proceeds of the remarketing efforts.  At best, the parol evidence on this issue creates a question of fact.   While the majority finds that the contractual language in section 4.4(b) obligated Enterasys to provide Fleet with 100% recovery of its financing, it omits the title of that section: "[Enterasys] Breach and Remedies."  It is clear, then, that section 4.4(b) is a remedy provision for an Enterasys breach of the Remarketing Agreement, not a recourse provision in the event that the deal with Vitts "went bad," as the trial court held.  In fact, section 4.4(b) is unrelated to any breach or default by the customer, Vitts.  

The language is clear that upon Enterasys' breach of the Remarketing Agreement, the parties agreed in section 4.4(b) to provide a formula to determine the damages as a remedy to Fleet for that breach.  Thus, I would find that this section is a liquidated damages clause.  See 
Penske Truck Leasing, Co.
, 311 Ill. App. 3d at 454-55 (finding a liquidated damages clause where the paragraph did not set forth a sum certain in case of a breach by the customer, but provided a formula for computing damages in case of a breach).  However, I believe that fact questions remain as to whether section 4.4(b) is enforceable or a penalty.  Therefore, I would reverse the decision of the trial court and remand for further proceedings.  

FOOTNOTES
-6:
The parties did not raise the applicability of Article 9 of the Illinois Uniform Commercial Code-Secured Transactions (810 ILCS 5/9-101 
et
 
seq
. (West 2002)) below.  Therefore, we do not address it here.