NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-1026
_____

WARREN HILL, LLC

v.

SFR EQUITIES, LLC,

Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-18-cv-01228)
District Judge: Honorable Harvey Bartle III
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
December 10, 2020

Before: McKEE, PORTER, FISHER, *Circuit Judges*.

(Filed: February 16, 2021)
_____

OPINION[*]
_____

FISHER, *Circuit Judge*.

Vendor Assistance Program LLC (VAP) participates in the Illinois Vendor

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7
does not constitute binding precedent.

Payment Program as a qualified purchaser of accounts receivable from vendors who do business with the State of Illinois. The plaintiff in this case, Warren Hill, LLC, owned part of VAP. In 2016, Warren Hill sold its interest in VAP to defendant SFR Equities, LLC. Part of the purchase price was to be paid over time based on (1) amounts deposited or held in financial instruments specified in Section 1.2(e) of the parties' purchase agreement, and (2) VAP's "Net Income," as defined in Section 1.2(d) of the agreement.[1] The parties later disagreed over the meaning of these provisions and Warren Hill sued SFR for breach of contract. The District Court entered summary judgment in Warren Hill's favor. SFR appeals. We will affirm.[2]

Section 1.2(e) of the agreement required SFR to pay Warren Hill, for three years following the closing of the deal, 16.623% of "any and all amounts . . . held in the form of any financial instrument, in each case as may be required pursuant to the terms of any financing arrangement among VAP and any of its lender(s)."[3] SFR argues that this amount should have been zero, and the District Court erred in concluding otherwise, because the contractual language refers only to a financing arrangement among VAP and "its lender(s)"—that is, entities that loaned money to VAP.

---

[1] App. 119-20.

[2] The District Court had jurisdiction under 28 U.S.C. § 1332(a). We have jurisdiction under 28 U.S.C. § 1291. "We review a district court's grant of summary judgment de novo." *Tundo v. County of Passaic*, 923 F.3d 283, 286 (3d Cir. 2019).

[3] App. 120. Section 1.2(e) also required payments of a portion of amounts held in other accounts, but those provisions are not in dispute.

2

Illinois law governs this dispute.[4] Under Illinois' well-settled principles of contract interpretation, "the primary objective is to give effect to the intention of the parties," and the primary evidence of the parties' intention is "the language of the contract itself."[5] Illinois law recognizes that "[a] contract does not exist in a vacuum; its terms must be understood in light of the commercial context within which it was drawn."[6] Therefore, a court looks not only "to the instrument itself," but also to "its purposes and the surrounding circumstances of its execution and performance."[7] While a court may not rely on evidence about the parties' negotiations or the witnesses' recollections to alter the terms of a contract, it must "place itself as nearly as it can in the same situation as the parties who made the contract" and "view the circumstances as they viewed them . . . so it may judge the meaning of the words and their application to the things described as the parties judged and applied them."[8]

The District Court did not err in interpreting Section 1.2(e). It viewed the language in context, taking into account the structure and requirements of the Illinois Vendor Payment Program. Under the Vendor Payment Program, the District Court explained,

---

[4] App. 126 (agreement's choice-of-law clause).

[5] *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011).

[6] *Fleet Bus. Credit, LLC v. Enterasys Networks, Inc.*, 816 N.E.2d 619, 629 (Ill. App. Ct. 2004).

[7] *Id.*

[8] *Ill. Commerce Comm'n v. Cent. Ill. Pub. Serv. Co.*, 322 N.E.2d 520, 522-23 (Ill. App. Ct. 1975) (quoting *Armstrong Paint & Varnish Works v. Cont'l Can Co.*, 133 N.E. 711, 713 (Ill. 1921)).

3

"VAP facilitates the creation of . . . statutory trusts," and the State of Illinois approves those trusts as "Qualified Purchaser[s] in the [Vendor Payment Program] in reliance on representations made by VAP."[9] VAP is "the manager of the trust[s]."[10] To buy accounts receivable, the trusts need money, which they borrow from banks. VAP's role is to "locate[] the lending banks and arrange[] the financing for the trusts it has established to purchase the receivables."[11] There is no dispute about these facts.

To carry out its business, then, VAP does not borrow money—rather, it arranges for the trusts to borrow money from banks it works with. The District Court did not err in ruling that these banks are "its [VAP's] lenders," as the phrase is used in the contract.[12] Interpreting "its lenders" to mean banks that loan money to VAP might make sense in a vacuum, but it does not make sense in the context of the Vendor Payment Program, which is the basis of VAP's business. Therefore, SFR's proposed interpretation would erroneously ignore Illinois contract interpretation principles.

SFR also argues that the District Court erred in interpreting Section 1.2(d) of the agreement. That section required SFR to pay Warren Hill, for three years following the closing of the deal, fifty percent of VAP's "Net Income."[13] "Net Income" is defined as "Revenue" minus "Expenses," and "Revenue" includes "any and all fees earned by VAP

---

[9] App. 51.
[10] App. 51.
[11] App. 52.
[12] App. 68, 120.
[13] App. 119.

in its capacity as a manager or an administrator of (1) the Vendor Assistance Trust and/or (2) any other trust or account maintained in the course of VAP's business."[14] SFR argues that some of the fees the District Court included in Revenue were "earned" not by VAP but by Bluestone Capital Management, LLC, and Blue Stone Financial, LLC, two entities that were formed after SFR bought Warren Hill's interest in VAP.

The District Court correctly rejected SFR's argument. The Court noted that it is undisputed that "VAP is the only manager of trusts," and that it receives trust management fees.[15] SFR focuses on the word "earned" in the Revenue definition, arguing that the Bluestone entities "earned" a large portion of the fees because they did the work for which the State of Illinois paid fees to VAP. The central case SFR relies on to support its argument is a Tax Court case concerning which of two related business entities had earned a particular stream of income under the then-current federal Tax Code.[16] SFR is correct insofar as it argues that the word "earned" may have different meanings in different legal contexts. But under Illinois law, "the fact that [a] word . . . in isolation might be subject to different meanings has no bearing on the use of the word in [a] contract . . . when the meaning of the word is clear in the contract."[17] Here, the meaning

---

[14] App. 119.
[15] App. 33.
[16] *Nat Harrison Assocs., Inc. v. Comm'r*, 42 T.C. 601, 617-20 (1964).
[17] *Thompson*, 948 N.E.2d at 48; *see also Foxfield Realty, Inc. v. Kubala*, 678 N.E.2d 1060, 1063 (Ill. App. Ct. 1997) ("Although the term 'sale' has no fixed or invariable meaning, it is to be interpreted in accordance with the manifest intention of the parties.").

of the agreement is clear, and the District Court correctly concluded that the fees described in Section 1.2(d) include money VAP earned as the trust manager and then paid to the Bluestone entities.

The fact that VAP used some of its trust management fees to pay the Bluestone entities for services they rendered to VAP did not alter the character of the income as "fees earned by VAP in its capacity as a manager" of the trusts.[18] Nor does it make any difference that VAP paid the Bluestone entities by assigning them a portion of its fees, rather than receiving the fees and then paying the Bluestone entities in a separate transaction. As the District Court held, "regardless of whether VAP receives the fees or directs them to be paid elsew[h]ere, they are 'earned by VAP in its capacity as manager' of the trusts."[19]

SFR also contends that the District Court erred in its construction of Section 1.2(d) because it improperly considered evidence beyond the four corners of the agreement. Under Illinois' four corners rule, "the intention with which [a contract] was executed must be determined from the language used" and "is not to be changed by extrinsic evidence."[20] The District Court did not violate this rule. The Vendor Payment Program,

---

[18] App. 119.

[19] App. 80 (quoting Section 1.2(d) of the agreement).

[20] *Air Safety, Inc. v. Tchrs. Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999) (internal quotation marks and citations omitted); *see also* App. 126 (agreement's integration clause, providing that "[t]his Agreement . . . represents the entire agreement of the parties with respect to the subject matter hereof").

6

and VAP's participation in it, form the factual backdrop of this case. The Court correctly applied the terms of the contract to the facts of the case.[21] It did not impermissibly rely on evidence such as the parties' contract negotiations or their questionable recollections of what the terms were supposed to mean.[22] Finally, SFR argues that the agreement did not prohibit the formation of the Bluestone entities. We do not disagree. The question, however, is not whether the entities were permitted to be formed—but whether money VAP earned and then paid to the Bluestone entities constitutes "fees earned by VAP in its capacity as a manager" of the trusts.[23] It does, for the reasons we have explained.

For the foregoing reasons, we will affirm the District Court's judgment.

---

[21] *See, e.g.*, *Foxfield Realty*, 678 N.E.2d at 1061-62 (interpreting a right-to-sell agreement between a real estate agency and homeowners, taking into account the facts including the deed through which the ownership of the house was transferred); *United Airlines, Inc. v. City of Chicago*, 507 N.E.2d 858, 858-59 (Ill. 1987) (interpreting an airport lease agreement between airlines and the city, taking into account the facts including the Chicago Sales Tax Ordinance under which the city sought to tax jet fuel). The District Court cited *United Airlines* for the proposition that "the court is not confined to the strict and literal construction of the language used if doing so would frustrate the intention of the parties in light of the entire contract." App. 32. SFR asserts that the District Court erred because, according to *Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 420 (7th Cir. 1998), this principle applies only in cases of mutual mistake. We are not troubled by the District Court's citation of *United Airlines*, and we do not decide whether *Grun* accurately states Illinois law, because in this case nothing more than a strict and literal construction of the parties' agreement is needed.

[22] *See Armstrong Paint*, 133 N.E. at 713.

[23] App. 119.